HOME BUILDERS LEAGUE OF SOUTH JERSEY, INC., A NEW JERSEY NONPROFIT CORPORATION, AWARD HOMES, INC., A NEW JERSEY CORPORATION, CHIUSANO BROS., INC., A NEW YORK CORPORATION QUALIFIED TO DO BUSINESS IN NEW JERSEY, LINCOLN PROPERTY CO., N.E., INC., A TEXAS CORPORATION QUALIFIED TO DO BUSINESS IN NEW JERSEY, PLAINTIFFS-RESPONDENTS, AND STANLEY C. VAN NESS, PUBLIC ADVOCATE OF THE STATE OF NEW JERSEY, SENIOR CITIZENS ADVOCATE CENTER, GRAY PANTHERS OF SOUTH JERSEY, SOUTH JERSEY TENANTS ORGANIZATION, PLAINTIFFS-RESPONDENTS, CROSS-APPELLANTS, v. TOWNSHIP OF BERLIN, DEFENDANT, AND TOWNSHIP OF VOORHEES, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT-APPELLANT, CROSS-RESPONDENT.

Argued April 3, 1979—Decided July 30, 1979.

*Mr. Lawrence P. Engrissei* argued the cause for appellant-cross-respondent (*Mr. Sal B. Daidone*, attorney).

*Mr. Carl S. Bisgaier*, Director, Division of Public Interest Advocacy, argued the cause for respondents-cross-appellants (*Mr. Stanley C. Van Ness*, Public Advocate, attorney; *Mr. Bisgaier, Ms. Linda R. Hurd*, Assistant Deputy Public Advocate

and *Mr. Kenneth E. Meiser*, Assistant Deputy Public Advocate, on the brief).

*Mr. Gerald E. Haughey* argued the cause for respondents (*Messrs. Brandt, Haughey, Penberthy & Lewis*, attorneys).

The opinion of the court was delivered by

SCHREIBER, J.

At issue in this case is the validity of provisions in a municipal zoning ordinance which impose minimum floor area requirements for residential dwellings irrespective of the number of occupants living in the home and unrelated to any other factor, such as frontage or lot size. The challenge was initiated when the Home Builders League of South Jersey, Inc. (League) and three builders, Award Homes, Inc., Lincoln Property Co., N.E., Inc., and Chiusano Bros., Inc., filed a complaint in lieu of prerogative writ in the Superior Court seeking invalidation of the floor area minima in the zoning ordinances of four municipalities in Camden County—Voorhees Township, Berlin Township, and the Boroughs of Pine Hill and Stratford. The New Jersey Public Advocate, the Senior Citizens Advocate Center, the Gray Panthers of South Jersey, and the South Jersey Tenants Organization were permitted to intervene as plaintiffs. At the conclusion of an extended trial the trial court found defendants' "nonoccupancy based" floor area minima to be unrelated to the public health, safety or welfare and hence an arbitrary, capricious and unreasonable exercise of the municipal zoning power. Defendants were given 90 days to amend their ordinances to provide for occupancy-related floor area standards. 157 *N.J.Super.* 586 (Law Div.1978).

Only Voorhees Township appealed. Plaintiff-intervenors filed a cross-appeal because of the trial court's "failure to declare occupancy-based floor space requirements greater than the minimum necessary to protect the public health, safety and general welfare unreasonable *per se,* irrational, arbitrary and void."

Before the case was heard in the Appellate Division, we granted direct certification on our own motion, pursuant to *R.* 2:12–1. 77 *N.J.* 503 (1978). We now affirm, albeit for slightly different reasons from those given by the trial court.

## I

A preliminary issue is whether plaintiffs have standing to bring this action. Plaintiffs fall into two major categories: builders, consisting of a trade organization and three private builders, and the public, represented by the Public Advocate, the Senior Citizens Advocate Center, the Gray Panthers of South Jersey and the South Jersey Tenants Organization.

Defendant has argued strenuously before us that in determining whether plaintiffs have standing, we should apply the criteria for standing in the federal courts enunciated by the United States Supreme Court. Under the test applied in *Warth v. Seldin*, 422 *U.S.* 490, 502, 95 *S.Ct.* 2197, 2207, 45 *L.Ed.*2d 343, 357 (1975), plaintiffs would have to allege and show that they themselves have been injured economically or otherwise and "not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." See also *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 *U.S.* 252, 97 *S.Ct.* 555, 50 *L.Ed.*2d 450 (1977). However, we are not bound by *Warth*, and insofar as its requirements are more restrictive than what we have traditionally demanded of plaintiffs to establish standing, we have chosen not to follow it.[1]

---

[1] A number of commentators have suggested that *Warth's* limited standing principle was adopted in zoning cases to discourage institution of such litigation in the federal courts on the ground that such actions more properly belong in the state courts. See, *e. g.*, Sager, "Insular Majorities Unabated: *Warth v. Seldin* and *City of Eastlake v. Forest City Enterprises, Inc.*," 91 *Harv.L.Rev.* 1373, 1389–1392 (1978); Ellickson, "Suburban Growth Controls: An Economic and Legal Analysis," 86 *Yale L.J.* 385, 472 (1977); "The Supreme Court, 1974 Term," 89 *Harv.L.Rev.* 47, 194–195 (1975).

Our leading case on the subject of standing is *Crescent Park Tenants Ass'n v. Realty Equities Corp.*, 58 *N.J.* 98 (1971). Justice Jacobs, after reviewing the New Jersey cases and noting that traditionally they have taken a less stringent approach, distinguished the federal law and laid down the general principles which are to be applied here.

> Unlike the Federal Constitution, there is no express language in New Jersey's Constitution which confines the exercise of our judicial power to actual cases and controversies. *U.S.Const.* art. III, § 2; *N.J.Const.* art. VI, § 1. Nevertheless we will not render advisory opinions or function in the abstract (*New Jersey Turnpike Authority v. Parsons,* 3 *N.J.* 235, 240 (1949)) nor will we entertain proceedings by plaintiffs who are "mere intermeddlers" (*Baxter v. Baxter,* 43 *N.J.Eq.* 82, 86 (*Ch.* 1887), aff'd, 44 *N.J.Eq.* 298 (*E. & A.* 1888), or are merely interlopers or strangers to the dispute (*Bergen County v. Port of New York Authority et al.,* 32 *N.J.* 303, 307, 318 (1960)). Without ever becoming enmeshed in the federal complexities and technicalities, we have appropriately confined litigation to those situations where the litigant's concern with the subject matter evidenced a sufficient stake and real adverseness. In the overall we have given due weight to the interests of individual justice, along with the public interest, always bearing in mind that throughout our law we have been sweepingly rejecting procedural frustrations in favor of "just and expeditious determinations on the ultimate merits." [58 *N.J.* at 107–108]

■ Thus, plaintiffs must show both a sufficient stake in the outcome of the proceedings and that their position is adverse to that of defendants. These prerequisites are inherently fluid and "in cases involving substantial public interest * * * 'but slight private interest, added to and harmonizing with the public interest' is sufficient to give standing." *Elizabeth Federal Savings & Loan Ass'n v. Howell,* 24 *N.J.* 488, 499 (1957). See also *In re Quinlan,* 70 *N.J.* 10, 34–35, cert. den. 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976). In addition, in zoning matters the Legislature has seen fit to express that public interest by defining an "interested party" as "any person, whether residing within or without the municipality, whose right to use, acquire, or enjoy property is or may be affected by any action taken under this act * * *." *N.J.S.A.* 40:55D–4. Accordingly, in

*Southern Burlington Cty. NAACP v. Tp. of Mt. Laurel,* 67 *N.J.*
151, 159 n. 3, 336 *A.*2d 713, app. dsm. 423 *U.S.* 808, 96 *S.Ct.* 18, 46
*L.Ed.*2d 28 (1975), this Court, relying on a virtually identical
statute (*N.J.S.A.* 40:55–47.1, repealed by *L.*1975, *c.* 291, § 80),
held that nonresidents who desired to secure decent housing had
standing.

█ Applying the foregoing principles, we hold that the Pub-
lic Advocate has standing. The Public Advocate's standing may
also be justified alone on his authority to represent the interests
or rights of citizens of this State, or a broad class of such
citizens, arising out of the laws of this State, *N.J.S.A.* 52:27E–
30, it being within his "discretion to represent or refrain from
representing the public interest in any proceeding." *N.J.S.A.*
52:27E–31. His assertion that some are being deprived of the
opportunity to obtain adequate housing because of the minimum
square footage building requirement which he equates with
creating unnecessarily higher cost housing sets forth a sufficient
interest justifying his standing in these proceedings.[2]

We are also satisfied that the Home Builders League of South
Jersey, Inc. may rightfully maintain this action. The League,
an incorporated nonprofit association whose members are en-
gaged in the business of housing construction or related busi-
nesses in Camden County, has four classes of membership:
builders, developers, subcontractors, and a miscellaneous catego-
ry which includes banks, title companies, financial and lending

[2]In view of the fact that the three intervening public interest organizations
(Gray Panthers of South Jersey is a small group whose members are mostly
from Camden County and are interested in housing for the elderly; South
Jersey Tenants Organization has 500 members interested in available rental
housing; Senior Citizens Advocate Center is a group representing low income
senior citizens in Camden County) participated in the case only through the
Public Advocate, we find it unnecessary to pass on the question of the
standing of these organizations.

companies, and others who have an interest in the housing market in southern New Jersey. Its members are ready and willing to build homes in Voorhees, but the size requirements foreclose their opportunity to construct small homes at lower prices for which there is a substantial market. It claims that plaintiff builders and others similarly situated continue to be deprived of that opportunity, and that housing appropriate to the needs, desires and resources of a large segment of the population of Camden County and its region will not be constructed in defendant towns or elsewhere in Camden County or its region.

No question exists concerning the League's opposition to the zoning ordinance's provisions. The main difficulty is whether the League (or its members) has a sufficient stake in the outcome of the litigation. There is no allegation that any specific project of any of the League's members is currently precluded either by the ordinances or by defendant's actions in enforcing them. Nor is there any allegation that any member has applied to Voorhees for a building permit or a variance. See *Warth v. Seldin, supra,* 422 *U.S.* at 516, 95 *S.Ct.* at 2214, 45 *L.Ed.*2d at 365. However, even though there is nothing in the allegations or record to establish "injury in fact," there are ample indications of a substantial likelihood of harm, which in view of the relevant statute and case law are sufficient.

We have previously recognized that a deprivation of commercial opportunity may be a sufficient stake to permit a nonresident to challenge a zoning ordinance. In *Al Walker, Inc. v. Borough of Stanhope,* 23 *N.J.* 657 (1957), plaintiff, a retail seller of trailer homes whose place of business was outside the defendant municipality, challenged a local ordinance which licensed and regulated trailer camps. This Court held that "[t]here has been real and substantial interference with [plaintiff's] business and the serious legal questions [plaintiff] has raised should, in the interest of the public as well as the plaintiff, be passed upon without undue delay." 23 *N.J.* at 666. Standing was granted

despite the lack of certainty that plaintiff, even if it ultimately prevailed on the merits, would be able to sell any trailers in the defendant municipality.

Similarly, there was no guarantee that plaintiffs in the *Mount Laurel* litigation, even if successful, would obtain what they were seeking, *i. e.*, decent housing in Mount Laurel. Nevertheless, in view of the substantial public interest in the question to be litigated, as well as the statute, *N.J.S.A.* 40:55–47.1, which appeared to require something less than "injury in fact," plaintiffs were held to have standing. The same considerations are equally pertinent here. There is a strong likelihood that some League members, if victorious, will build houses with smaller floor areas than presently permitted. It is clear from the record that the demand for smaller houses is substantial and likely to continue. Moreover, the exclusionary aspect of the zoning provision and the strong public interest involved justify a balancing or weighing in favor of having the matter adjudicated.[3]

## II

Voorhees Township is located within the Philadelphia-Camden area, less than 15 miles southeast of Camden. It is a developing municipality. Its population grew from 3784 in 1960 to 6214 in 1970, and 7320 in 1976. The Camden County Planning Board has projected an increase in population to 23,458 by 1990, and the Township's master plan estimates population at full development to be 37,627. Voorhees Township is linked to the Philadelphia-Camden urban center by a number of highways and the PATCO Hi-Speed rail line. The Township's area is 7345 acres.

---

[3] The three individual builders are similarly alleged to be "ready, willing and able" to construct dwellings which are at present barred by defendant's floor area minima. However, no allegation was made nor proof offered that these builders were League members, or were engaged in the construction of homes in Voorhees or in the surrounding area. Since we have held that the League has standing, we find it unnecessary to determine the status of the builders.

In 1970, there were 3899 acres of vacant developable land (exclusive of (1) land with slopes greater than 12%; (2) wetlands; (3) qualified farmlands; and (4) public lands), or about 53% of the Township's total area.

The Voorhees Township Zoning Ordinance establishes a number of residential zones, each with different lot area, frontage, and floor area minima. They may be summarized as follows:

| Zone | Minimum Lot Size (sq. ft.) | Minimum Frontage (ft.) | Minimum Floor Area (sq. ft.) |
|---|---|---|---|
| R.R. (rural)—single family houses | 43,560 | 200 | 1,600 |
| R-100A—single family houses | 15,000 | 100 | |
| up to 3 bedrooms | | | 1,600 |
| each additional bedroom | | | 400 |
| RD-2—single family houses | 12,500 | 90 | |
| 60% of subdivision | | | 1,200 |
| 20% of subdivision | | | 1,351 |
| 20% of subdivision | | | 1,501 |
| R-100—single family houses | 12,500 | 100 | 1,200 |
| R-75—single family houses | 9,375 | 75 | 1,100 |
| T.C. (Township Center) | | | |
| apartments | 10,000 | 100 | none |
| townhouses: | 1,000 | none | |
| 2 bedrooms | | | 1,200 |
| 3 bedrooms | | | 1,350 |
| 4 bedrooms | | | 1,500 |
| Avian—single family houses | 1,000 | | |
| 85% of subdivision | | 20 | |
| 15% of subdivision | | 10 | |
| 1-4 rooms | | | none |
| 5 rooms | | | 1,200 |
| each additional room | | | 150 |
| P.U.D. (planned unit development) | | | |
| apartments | flexible | flexible | 750 |
| townhouses: | flexible | flexible | |
| 1-2 bedrooms | | | 1,200 |
| 3 bedrooms | | | 1,350 |
| 4 bedrooms | | | 1,500 |
| single family houses | 10,000 | flexible | 1,200 |

The minimum floor area requirements in the different zones are not strictly comparable: in the R.R., R–100, R–75, T.C. and Avian zones, the minima are expressed in terms of gross floor area, while the R–100A and RD–2 requirements are for "minimum living area," which is defined as "the living space in any house, exclusive of porches, attached sheds and garages." The P.U.D. minima are stated in terms of "habitable floor area," which is defined as gross floor area less garages, open patios, basements and unfinished attics.

The R–75 and R–100 zones are virtually fully developed. In the Avian section, where the eased restrictions are apparently the result of prior litigation, the room count excludes bath and powder rooms. The Avian district is the only one in which some single family houses may be constructed irrespective of a minimum floor area. Finally, the lot size requirement in the R–100A zone and the frontage requirement in RD–2 allow for some variation in any proposed subdivision.

### III

Validity of a zoning ordinance is determined by testing it against certain well-established criteria. First, the statute must authorize the municipality's exercise of the power in question. Guidelines which should be observed are that the provisions are presumptively valid, *Hyland v. Mayor of Morris Tp.*, 130 *N.J.Super.* 470, 476 (App.Div.), aff'd o.b. 66 *N.J.* 31 (1974), the wisdom or advisability of the enactment is properly a legislative function, *Ward v. Montgomery Tp.*, 28 *N.J.* 529, 539 (1959), and laws granting authority to municipalities should be construed broadly and liberally, *N.J.Const.* (1947), Art. IV, § VII, par. 11. Second, there are constitutional constraints which must be observed. Zoning, reflecting as it does the exercise of the police power, *N.J.Const.* (1947), Art. IV, § VI, par. 2, is subject to due process requirements. *Berger v. State*, 71 *N.J.* 206, 223 (1976). Arbitrary or unreasonable zoning ordi-

nances cannot stand. *Pascack Ass'n, Ltd. v. Mayor of Washington Tp.*, 74 *N.J.* 470, 483 (1977). The purposes sought to be accomplished must justify the restrictions placed on the use of one's land. *Gruber v. Mayor of Raritan Tp.*, 39 *N.J.* 1, 12 (1962). The means used to attain the ends must be reasonably related to those ends. *State v. Baker*, 81 *N.J.* 99, 105–106 (1979).

In making this analysis, however, it is important to recognize the overlapping between the statutory and constitutional requirements. We have held that under the New Jersey Constitution a zoning regulation must promote public health, safety, morals or the general welfare and "[c]onversely, a zoning enactment which is contrary to the general welfare is invalid." *Mount Laurel, supra,* 67 *N.J.* at 175. The Municipal Land Use Law states as one of its purposes "to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals and general welfare." *N.J.S.A.* 40:55D–2(a).

In support of its contention that the municipality has the authority to enact a provision setting forth floor space minima for residences, Voorhees relies upon two provisions in the Municipal Land Use Law. *N.J.S.A.* 40:55D–65(b) provides that a zoning ordinance may regulate the "size of buildings," "the percentage of lot" that may be occupied, and for these purposes "may specify floor area ratios and other ratios and regulatory techniques governing the intensity of land use and the provision of adequate light and air." Second, *N.J.S.A.* 40:55D–62(a) states that "[t]he zoning ordinance shall be drawn with reasonable consideration to the character of each district and its peculiar suitability for particular uses and to encourage the most appropriate use of land."

Even though *N.J.S.A.* 40:55D–65(b) might be read literally to include the power to impose minimum floor space (regulation of the size of a building), the end result must not be contrary to the general welfare and in fact must further the

public health, safety, morals or general welfare. Almost inevitably restrictions on the use of land will have both salutary and detrimental effects. A provision which has some beneficial effect will not automatically be deemed valid and consonant with the general welfare. Attention must also be directed toward the detrimental effects that a particular provision has. A provision which has some relationship to promotion of the general welfare or any subpart thereof, such as public health, safety, or any of the other purposes designated in the Municipal Land Use Law, *N.J.S.A.* 40:55D–2, would be upheld if it does not at the same time promote ends which are contrary to the general welfare. Where, however, a zoning provision, in addition to promoting legitimate zoning goals, also has effects contrary to the general welfare, closer scrutiny of the provision and its effects must be undertaken. The fact that a provision may have some adverse effect is not determinative. Rather, the court is required to decide whether a proper legislative goal is being achieved in a manner reasonably related to that goal.

Consider, for example, minimum lot size. Such a restriction may be closely related to the goals of public health and safety, as well as preserving the characteristics of a neighborhood. Thus, such a restriction may be valid despite the exclusionary impact resulting from increased housing costs due to minimum lot size. Compare *Fischer v. Tp. of Bedminster*, 11 *N.J.* 194 (1952) (upholding validity of five-acre minimum lot size) with *Schere v. Tp. of Freehold*, 119 *N.J.Super.* 433 (App.Div.1972), certif. den. 62 *N.J.* 69 (1972), cert. den. 410 *U.S.* 931, 93 *S.Ct.* 1374, 35 *L.Ed.*2d 593 (1973) (invalidating minimum lot restriction of slightly less than one acre). Where, however, these adverse consequences become too predominant, the zoning provision cannot stand, despite the fact that it bears some relationship to legitimate zoning purposes.

Minimum floor area requirements bear a direct relationship to the cost of a house. The larger the house, the more likely its

cost will be greater. Living in a more spacious house will be more expensive due to higher taxes, mortgage payments, and expenses for heat, maintenance, and insurance. The potential exclusionary effect of minimum floor area requirements was commented upon by Justice Hall in *Mount Laurel*:

> [T]he township's general requirements of a minimum dwelling floor area of 1,100 square feet for all one-story houses and 1,300 square feet for all of one and one-half stories or higher is without regard to required minimum lot size or frontage or the number of occupants (see *Sente v. Mayor and Municipal Council of City of Clifton*, 66 *N.J.* 204, 208–209 (1974)). * * * Again it is evident these requirements increase the size and so the cost of housing. The conclusion is irresistible that Mount Laurel permits only such middle and upper income housing as it believes will have sufficient taxable value to come close to paying its own governmental way. [67 *N.J.* at 183–184]

In his concurring opinion Justice Pashman referred to the same problem when he wrote:

> The effect on the cost of housing of such requirements is obvious. If one assumes construction costs of $20 per square foot of floor space, a 1,000 square foot minimum imposes a corresponding minimum figure of $20,000 upon the portion of the cost of a new house attributable to construction. A recent study of housing costs indicates that floor space is the single most important factor contributing to differences in prices for new housing, even more important than the socio-economic status of the municipality. [67 *N.J.* at 198–199; footnote omitted]

In another context in reference to a police power ordinance requiring a certain minimum floor area for each dwelling unit based on the number of occupants, we wondered

> whether the regulation was actually adopted for health reasons and not for some other purpose . . . regulations of this kind drastically affect the availability of housing, especially for large families of poor or modest means, like plaintiff's, as to whom there is undoubtedly a general severe shortage of decent, suitable living accommodations. [*Sente v. Mayor of Clifton*, 66 *N.J.* 204, 208 (1974)]

A similar comment would be appropriate here if the municipality's intent were to discriminate against those with moderate or lower incomes. If the Township's sole purpose in setting up the minima was to provide for more costly residences so as to exclude lower or moderate income persons, we would strike down this direct form of economic segregation. See, e. g., Lefcoe, "The Public Housing Referendum Case, Zoning, and the Supreme Court," 59 *Calif.L.Rev.* 1384, 1438–1439 (1971); Sager, "Tight Little Islands: Exclusionary Zoning, Equal Protection, and the Indigent," 21 *Stan.L.Rev.* 767, 781 (1969); Williams, "Planning Law and Democratic Living," 20 *Law & Contemp. Prob.* 317, 343 (1955); Haar, "Zoning for Minimum Standards: The Wayne Township Case," 66 *Harv.L.Rev.* 1051, 1055 (1953).

A limitation on a person's right to expend whatever amount he desires to construct a house—unrelated to appropriate purposes such as health, safety or welfare—would transgress constitutional due process standards. See *Brookdale Homes, Inc. v. Johnson*, 123 *N.J.L.* 602, 606 (Sup.Ct.1940), aff'd o.b. 126 *N.J.L.* 516 (E. & A. 1941). (The holding in *Brookdale Homes* that an ordinance imposing minimum restrictions on the size of dwellings to protect the character of a community and property values therein was invalid was overruled in *Lionshead Lake, Inc. v. Tp. of Wayne*, 10 *N.J.* 165, 172 (1952), app. dism. 344 *U.S.* 919, 73 *S.Ct.* 386, 97 *L.Ed.* 708 (1953).) The few cases which touch on the validity of zoning ordinances prescribing minimum dollar cost of houses have indicated them to be unreasonable. See *Stein v. City of Long Branch*, 2 *N.J.Misc.* 121 (Sup.Ct.), app. dism. 100 *N.J.L.* 413 (E. & A. 1924); *County Comm'rs v. Ward*, 186 *Md.* 330, 46 *A.2d* 684 (1946); *Appeal from Ordinance, Borough of Speers*, 28 *Wash.Co.* 221 (Pa.Quar.Sess.1948).

■ We have acknowledged that zoning restrictions and limitations may have some economic effect in elevating the cost of a house, but nothing in the Municipal Land Use Law sanctions such economic segregation in and of itself as a proper zoning

goal. We hold that when it is shown that a municipality has adopted as part of its zoning ordinance a minimum size living area provision which is on its face unrelated to any other factor, it will be presumed to have acted for improper purposes. The burden is then on the municipality to establish that a valid basis does exist. *Cf. Mount Laurel, supra*, 67 *N.J.* at 180–181; *Robinson v. Cahill*, 62 *N.J.* 473, 492, *cert.* den. 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.*2d 219 (1973). We hasten to add that the establishment of such a basis does not terminate the judicial inquiry. At that point it must be determined whether the provision furthers or is contrary to the general welfare. It is then that the court must weigh and balance, as previously discussed, the exclusionary and salutary effects of the provision.

## IV

The bases which Voorhees has advanced are that the minima will (1) promote public health and safety and (2) maintain the nature of residential neighborhoods and conserve property values.

### A.  Public Health and Safety

We agree with the trial court's factual findings that minimum floor area requirements are not *per se* related to public health, safety or morals. The record contains substantial evidence in this respect. Dr. Eric Mood, Associate Clinical Professor of Public Health in the Department of Epidemiology and Public Health in the Yale School of Medicine, testified that the Voorhees floor space requirements were not related to and did not serve the public health, safety and welfare. In his opinion such criteria could be so related only if they were based on occupancy. The same opinion was expressed by John Rahenkamp, who has been engaged in land planning for years, and Alan Mallach, who

heads a consulting firm which works principally in the area of housing.

Professor Haar has noted the irrelevance of minimum dwelling size to the traditional zoning concerns of safety and health:

Prescribing minimum standards for size of a land parcel will indirectly but effectively control bulk and the density of population, thus securing light, air, and open space. In addition to preventing overcrowding of land and undue concentrations of people, the minimum land requirement secures safety from fire, panic, contagions, and other dangers. *And further, the maintenance of large and open areas free from noise and bustle and the preservation of natural surroundings may be legitimate planning purposes in themselves. Minimum requirements as to dwelling size, however, accomplish none of the traditional purposes of the zoning power.* Where the problem is size of the building occupying the land, the goals of physical planning can be achieved only in terms of maximums. Thus building bulk regulations are almost invariably formulated in such terms (height, cubage, percentage of lot coverage, floor area ratio). [Haar, *supra*, 66 *Harv.L.Rev.* at 1060–1061; emphasis supplied; footnotes omitted]

The ratio of occupants to space obviously can affect public health, family stability and emotional well being. 2 N. Williams, *American Planning Law* § 63.01 at 626 (1974). This interrelationship is found in standards fixed by the American Public Health Association which set a minimum residency requirement of 150 square feet for one person and 100 square feet for each additional occupant. These criteria are currently recommended by the U.S. Department of Housing and Urban Development (HUD). HUD has always prescribed occupancy-based standards in relation to space.

We have previously adverted to the different area minima in Voorhees' various residential zones. Since the minima necessary for public health, safety and morals in the R.R., RD–2 and other zones are unquestionably the same, it follows that the Township was not considering health, safety and morals when it enacted these provisions. As the trial court aptly commented, "It is ridiculous to suggest that an 1,100 square foot house may be

'healthful' in one part of town and not another." 157 *N.J.Super.* at 601.

Nor can minimum floor areas be utilized to prevent over-crowding. In the absence of some relationship between living areas and the number of occupants, unless there is a ratio between the space and inhabitants, obviously the problem is not being alleviated. This is not to say that there is not a minimum below which any residence may not go without the risk of impairing the health of an inhabitant. In *State v. Baker*, 81 N.J. 99 (1979), Justice Pashman, in striking down zoning provisions relating to the number of occupants irrespective of space, wrote:

> An appropriate method to prevent overcrowding and congestion was suggested by this Court in *Kirsch Holding Co. v. Borough of Manasquan* [59 *N.J.* 241 (1971)]. We there stated that
>
> > [w]hen intensity of use, *i. e.*, overcrowding of dwelling units and facilities, [presents a problem] consideration might quite properly be given to zoning or housing code provisions, which would have to be of general application, *limiting the number of occupants in reasonable relation to available sleeping and bathroom facilities or requiring a minimum amount of habitable floor area per occupant.* [59 *N.J.* at 254 (emphasis supplied)] [81 *N.J.* at 110]

### B. Character of the Neighborhood and Conserving Property Values

The trial court mistakenly held that preservation of the character of a neighborhood and conservation of property values are no longer proper zoning purposes because of the repeal of *N.J.S.A.* 40:55–32 which had expressly referred to these objectives. Although the new statute omits the language that

> [s]uch regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land throughout such municipality[,] [*N.J.S.A.* 40:55–32, repealed by *L.*1975, c. 291, § 80]

it does state that

> [t]he zoning ordinance shall be drawn with reasonable consideration to the character of each district and its peculiar suitability for particular uses and to encourage the most appropriate use of land. [*N.J.S.A.* 40:55D–62(a)]

Although the phrase "conserving the value of property" does not appear in the existing statute, we have no doubt that the Legislature did not intend to deny the legitimacy of that consideration. It is intertwined with the character of a district. *N.J.S.A.* 40:55D–62(a). Conservation of the value of property is subsumed within the express purposes of promoting the "general welfare," the "well-being of neighborhoods," and a "desirable visual environment." *N.J.S.A.* 40:55D–2(a), (e) and (i).[4] See *Pascack Ass'n, Ltd. v. Mayor of Washington Tp., supra,* 74 *N.J.* at 483–484, holding that maintaining the character of a fully developed, predominantly single family residential community constitutes an appropriate desideratum of zoning. All of these goals are laudable and permissible. However, the method selected to attain them must be reasonable.

Whether the size of a house alone has relevance to the quality or property value of neighboring homes is a troublesome question. This is brought into sharp focus when the decision in *Lionshead Lake, Inc. v. Tp. of Wayne, supra,* is compared with the expert testimony in this case. The experts testified without exception that smaller houses do not because of their size cause a decrease in the value of adjacent dwellings or adversely affect

---

[4]Aesthetic considerations are apparently now expressly authorized in the zoning statute. See the concurring opinion of Justice Jacobs in *Lionshead Lake, supra,* 10 *N.J.* at 176, where he wrote that provisions in the zoning ordinance "were influenced in considerable part by aesthetic considerations" which he believed to be "entirely proper." See also *Westfield Motor Sales Co. v. Town of Westfield,* 129 *N.J.Super.* 528, 535–539 (Law Div.1974).

the character of the neighborhood. They pointed out that aesthetic qualities are best maintained through the use, *inter alia*, of lot size, setbacks, side yards, lot coverage ratios, topographical and landscaping requirements.

### Williams and Wacks have expressed a similar thought:

Increasing the size of houses has nothing to do with improving the appearance of an area. Topography has a lot to do with it, and the presence of trees has even more. (Landscaping and maintenance obviously are also important.) Perhaps most important of all is lot size, and particularly lot size in relation to house size; in fact, the present appearance of both the central plain and Lionshead Lake strongly suggests that an increase in house size can actually detract from the appearance of an area, unless lot sizes are increased proportionately. [Williams & Wacks, "Segregation of Residential Areas Along Economic Lines: Lionshead Lake Revisited," 1969 *Wis.L.Rev.* 827, 846]

### Professor Haar has written:

Certainly beauty has no relation to size. The ordinance, moreover, contains no guarantee of design or site planning. In addition, if the initial cost of building to meet the minimum size requirement is high, a family budget may not permit the additions to exteriors, such as planting and painting, which may be aesthetically desirable. [Haar, *supra*, 66 *Harv.L.Rev.* at 1057–1058]

The majority opinion in *Lionshead Lake, Inc. v. Tp. of Wayne, supra,* although referring to the fact that there are minima in housing below which the health of the occupants might be impaired, rested its conclusion in upholding several minimum living areas in the zoning ordinance on the protection of land values generally and of the character of the community.[5] *Lionshead* recognized that

---

[5]Some commentators have interpreted *Lionshead* as resting on public health grounds. See, *e. g.*, 2 *R. Anderson, American Law of Zoning*, § 8.06 at 22 (2d ed. 1976); 6 *P. Rohan, Zoning and Land Use Controls*, § 42.05[2][b] at 79–82 (1978). If that were its basis, it would certainly no longer be sound. See *Kirsch Holding Co. v. Borough of Manasquan, supra.*

[w]ith respect to every zoning ordinance, however, the question remains as to whether or not in the particular facts of the case and in the light of all of the surrounding circumstances the minimum floor-area requirements are reasonable. [10 *N.J.* at 174]

The opinion did not discuss the impact of economic segregation, although Justice Oliphant in dissent referred to that factor when he wrote:

Zoning has its purposes, but as I conceive the effect of the majority opinion it precludes individuals in those income brackets who could not pay between $8,500 and $12,000 for the erection of a house on a lot from ever establishing a residence in this community as long as the 768 square feet of living space is the minimum requirement in the zoning ordinance. A zoning provision that can produce this effect certainly runs afoul of the fundamental principles of our form of government. [10 *N.J.* at 181]

Shortly after *Lionshead*, the Court acknowledged in *Pierro v. Baxendale*, 20 *N.J.* 17 (1955), that when conditions change, the dangers of economic segregation may warrant a reexamination of *Lionshead*. In that case Justice Jacobs wrote on behalf of the majority:

We are aware of the extensive academic discussion following the decisions in the *Lionshead* and *Bedminster* cases, *supra,* and the suggestion that the very broad principles which they embody may intensify dangers of economic segregation which even the more traditional modes of zoning entail. * * * In the light of existing population and land conditions within our State these [municipal zoning] powers may be fairly exercised without in anywise endangering the needs or reasonable expectations of any segments of our people. If and when conditions change, alterations in zoning restrictions and pertinent legislative and judicial attitudes need not be long delayed. [20 *N.J.* at 29]

We have experienced that change in conditions which has been reflected in pertinent legislative and judicial attitudes. Zoning which excludes low and moderate income families for fiscal purposes has been condemned as contrary to the general

welfare. *Mount Laurel, supra* ; *Oakwood at Madison, Inc. v. Tp. of Madison,* 72 *N.J.* 481 (1977). As we have stated previously, once it is demonstrated that the ordinance excludes people on an economic basis without on its face relating the minimum floor area to one or more appropriate variables, the burden of proof shifts to the municipality to show a proper purpose is being served. This was a burden Wayne was not called upon to meet and Voorhees is. It is a burden which Voorhees has failed to meet.[6]

V

In conclusion we hold that on its face the Voorhees zoning ordinance prescribes minimum floor areas for residences which are unrelated to legitimate zoning purposes. Voorhees has not directed our attention to anything in the ordinance which ties these requirements to public health or safety or preservation of the character of the neighborhood. Rather, the ordinance appears to be directed solely toward economic segregation. Under these circumstances and in the absence of proofs showing a connection between the minima and the legitimate purposes of zoning (public health, safety and welfare), such as would be established by an occupancy relationship, the provisions must fall.

The judgment declaring invalid those provisions of the Voorhees Township zoning ordinance requiring that residential units contain minimum area floor space is affirmed. We perceive no reason to stay the effectiveness of our adjudication of invalidity.

---

[6]Though the trial was not conducted in this manner, our independent review of the record satisfies us that plaintiffs established that the size of a house did not bear a reasonable relationship to the character of the neighborhood including maintenance of land values.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER, and Judge HALPERN—7.

*For reversal*—None.