690 A.2d 655

ROBERT J. DAMURJIAN, PLAINTIFF–RESPONDENT, v. BOARD OF ADJUSTMENT OF THE TOWNSHIP OF COLTS NECK, DEFENDANT, AND THE TOWNSHIP OF COLTS NECK, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 20, 1997—Decided March 24, 1997.

Before Judges KING, CONLEY and LOFTUS.

*Richard J. Shaklee* argued the cause for appellant Twp. of Colts Neck (*McLaughlin, Bennett, Gelson & Cramer,* attorneys; *Mr. Shaklee,* on the brief).

*Peter S. Wersinger, III,* argued the cause for respondent Robert Damurjian (*Heffernan & Wersinger,* attorneys; *Mr. Wersinger,* on the brief).

The opinion of the court was delivered by

KING, P.J.A.D.

I.

In October 1990 the Township of Colts Neck (defendant) added Article 7, Section 711, Note 4 to its zoning ordinance. Note 4 provides:

> In the A–1, A–2, A–3 and AG zone[s], if the length of the principal building, projected on the front lot line, exceeds 90 feet, the required front, each side, and rear yard requirements shall be increased one foot for each foot the building projection exceeds 90 feet.

Robert A. Damurjian (plaintiff) owned a parcel of land in the A–1 zone on which he sought to build a single-family residential dwelling with an attached garage. The defendant contended that the "length" of his proposed dwelling, "as projected on the front lot line, would be approximately 127 feet," including the garage as attached.

In January 1994 plaintiff applied to the Board of Adjustment of the Township of Colts Neck (Board), requesting (1) a determination that the "enhanced setback provisions" in Note 4 did not apply to his property, or (2) a dimensional or bulk variance, pursuant to *N.J.S.A.* 40:55D–70(c)(2) of the Municipal Land Use Law (MLUL), from the "enhanced minimum rear yard and side

yard provisions" of Note 4. The Board denied both his interpretative application and his variance application.

Plaintiff then filed a two-count complaint in lieu of prerogative writ against defendant Colts Neck and the Board. In the second count, plaintiff demanded a judgment declaring Note 4 null and void. On October 19, 1995 the judge rendered a decision declaring "Article Seven, Section 711, Note 4, invalid," based on his conclusion "that the method of determining the front lot line projection bears no real and substantial relationship to the stated goals . . . for which Article Seven, Section 711, Note 4 was enacted." On November 13, 1995 the judge entered judgment in plaintiff's favor on the second count of his complaint, "invalidating the provisions of Article 7, Section 711, Note 4." From this judgment, and only this judgment, defendant appeals. Plaintiff does not appeal from the denial of his variance application.

On appeal defendant primarily contends that the judge erred because Note 4 is a "valid enactment under the Municipal Land Use Law and the New Jersey and United States Constitutions." We disagree and affirm. The judge did not fatally criticize either the "concept of enhanced setback requirements" or the "enhanced setback requirements" embraced in Note 4. Rather, the judge was careful to decide "only that the method of determining the front line projection, which triggers Article 7, Section 711, Note 4, is invalid."

█ We agree with the judge's ultimate conclusion. This section of the ordinance is invalid because there are no definitions of terms and no actual method for determining the front lot line projection in Note 4 or anywhere else in the zoning ordinance.

## II.

The ordinance contains no definitions for these terms used in Note 4:(a) "length of the principal building," (b) "projected," (c) "front lot line," and (d) "building projection." Nor does the ordinance describe the method in which the projection should be

determined. Oral argument revealed the critical nature of these elements, especially where the lots are odd-shaped and not rectilinear; the streets are curved; cul-de-sacs exist, and the structures are customized and not uniform in configuration, or canted or angled to the street, or indeed all of the these conditions exist.

Glenn Gerken, defendant's township engineer since 1980, testified that Note 4 was first adopted on October 2, 1990. Gerken said that he had "developed the procedure that [he] utilize[d]" to determine "whether the provisions of Note 4 apply to a particular property and a particular dwelling." Gerken testified that this procedure was not "set forth in Note 4" and that, while his procedure was the "only procedure [he] use[d]" to decide Note 4 questions submitted to him, he did not know if anybody else who reviewed Note 4 questions used a "different technique" to determine "whether Note 4 applies or does not apply."

Gerken said that the multi-step procedure he had developed was primarily based on "common sense," and had been developed over time by "trial and error." Gerken was then asked to explain his procedure. He said:

Q: What's the first step that you would do?

A: All right. What we would do is take the side lot lines and extend them out so they intersect at the street line.

Q: Okay.

A: Now I realize street line is not defined in the ordinance. But I consider the lot line along the street.

Q: Okay. So . . . that in your way of thinking, the front lot line is the street line.

A: No question about it.

\* \* \* \* \* \* \* \*

THE COURT: What's the next step you do? After you get to the front line, what's the next step that you do?

THE WITNESS: You take a straight line and connect it from the two points of intersection along the street line.

\* \* \* \* \* \* \* \*

BY MS. HEFFERNAN:

Q: What's your third step?

A: Third step is we establish ... perpendicular line[s] created in step two, just like a pair of dividers, and we moved those lines till it touches the two extreme portions of the lot [sic; house] which projects towards the street.

Q: And your fourth step.

A: Measure the distance along the line created in step two.

Q: And what does that give you?

A: Projected length.

THE COURT: Projected length of the house.

THE WITNESS: Correct.[1]

The judge then asked Gerken to explain the rationale behind his measuring procedure, and Gerken explained that the "rationale is what does somebody who is going along that street see of that house from the street." Gerken also explained that, by projected

---

[1] Gerken's report prepared for this litigation gave this description of his technique:

This report is being written to describe how I have interpreted Note 4 from Section 711, "Schedule of Limitations and Requirements Applicable to Each Zone" as contained on Page 162 of the Development Regulations Ordinance.

Note 4 reads as follows:

"In the A–1, A–2, and AG Zone, if the length of the principal building, projected on the front lot line, exceeds 90 feet, the required front, each side and rear yard requirements shall be increased one foot for each foot the building projection exceeds 90 feet."

Procedure to determine projected width:

1. Extend the minimum side yard set back on each side to intersect the front lot line.

2. Connect the two intersecting points created by No. 1 above with a straight line and extend beyond the intersection points as needed for No. 3 below.

3. Project at 90° angle to the line created in No. 2, a new straight line on each side of the structure and position it so that it touches the outer most portion of the structure.

4. Measure at right angles the distance between the two lines created in No. 3 above. THIS IS THE LENGTH OF THE PRINCIPAL BUILDING PROJECTED ON THE FRONT LOT LINE.

The above procedure works well for most situations, even for irregular lots on outer and inner radius: On cul-de-sac lots which wrap around the bulb, where the side setback line never intersects the street lines, some modifications are required.

There are five examples of different lot configurations attached hereto which shows the above procedure.

length of the house, he meant the length between the "most extreme limits of the house" as projected "along the street line." Finally, Gerken explained that he took the "straight line distance rather than a curve or linear distance along the street" in order to give the "benefit of the doubt to the applicant in every case" because, otherwise, "you'd always end up with a much longer distance." According to Gerken, the primary purpose of Note 4 was "aesthetics." The objective of Note 4 was to ascertain "how much [of the house] is facing the street line" from the visual perspective of "somebody who is going along that street."

William Queale, Jr., a professional planner, also testified on defendant's behalf. Queale expressed that the principal purpose of Note 4 was to reduce the "perception of overcrowding" by reducing the "perception of a wider building" as viewed from the street line. In other words, the "major thrust" of Note 4 was to reduce the "visual impact that a wider house might have versus a [more] narrow house."

Richard DiFolco, an engineer and planner, testified on plaintiff's behalf. DiFolco thought that Note 4 was "vague" and "not clear," because in Note 4 "[t]here is not [a] sufficient or a developed standard way of measuring the length or defining things such as the projection, which way you measure a projection, in order to come up with a uniform answer all of the time." Because under Note 4 the "actual length" of the house did not necessarily equate with the "projected length" of the house "as it's measured at the street line," DiFolco also said that "invocation of the enhanced setback requirements" of Note 4 was, in some cases, "dependent on something in addition to the [actual] length of the house," namely, on the "angle the house makes with the property line at the street." As DiFolco explained, solely by changing the angle of the house in relation to the front lot line, a house that was less than ninety feet in actual length could be rotated to project more than ninety feet on the front lot line, and a house that was more than ninety feet in actual length could be rotated to project less than ninety feet on the front lot line. Thus while neither the

footprint size nor the height of the house would change, such maneuvering would trigger the enhanced setback requirement.

On cross-examination, Queale acknowledged the accuracy of this proposition. However, because the primary purpose of Note 4 was to improve the "visual environment" by reducing the "visual impact that a wider house might have versus a [more] narrow house," Queale saw no legal relevance to this fact. In other words, Note 4 was not concerned with the angle of the house to the street per se, but rather with the perceived length of the house "when projected onto the street."

While the judge noted that "the purpose of Article Seven, Section 711, Note 4 was to maximize the appearance of open spaces," he concluded that "the method of determining the front lot line projection bears no real and substantial relationship to the stated goals ... for which Article Seven, Section 711, Note 4 was enacted." Therefore, he held "only that the method of determining the front lot line projection, which triggers Article 7, Section 711, Note 4, is invalid."

The judge explained his holding as follows:

Cross-examination of Mr. Queale explains the court's determination, keeping in mind the stated goal of the enhanced setback requirements. On cross-examination, Mr. Queale testified that a dwelling with a length of 90 feet, when parallel to the street, would have a projected length of 90 feet. If, however, you rotate the same dwelling a few degrees, the dwelling will have a projected length in excess of 90 feet. The structure has exactly the same dimensions, and the amount of unused land remains the same; however, the enhanced setbacks would be required.

Assuming one proposed a building with an actual length of less than 90 feet, by merely rotating the building, this same structure would trigger the enhanced setback requirements, even though the structures are identical, and the open spaces surrounding these structures are identical. Accordingly, the method used to determine the projected front line bears no real and substantial relationship to the desire for open spaces.

  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

As noted above, merely rotating a structure alters the front line projection. Accordingly, there appears to be no real and substantial nexus between the front line projection and the amount of open space upon a piece of property. This conclusion is supported by the testimony adduced at trial. This finding does not invalidate the concept of enhanced setback requirements. What it requires is a

method of determining the front line projection that bears a real and substantial relationship to the amount of open space present, and to the actual length of the building.

## III.

■ A zoning ordinance enjoys a presumption of validity. The party attacking the ordinance bears the burden of overcoming this presumption. *Riggs v. Long Beach Tp.*, 109 *N.J.* 601, 610–11, 538 *A.*2d 808 (1988). To be valid, the ordinance "must advance one of the purposes of the Municipal Land Use Law as set forth in *N.J.S.A.* 40:55D–2." *Id.* at 611, 538 *A.*2d 808.

Two purposes of the MLUL set forth in *N.J.S.A.* 40:55D–2 are:

c. To provide adequate light, air and open space;

. . . .

i. To promote a desirable visual environment through creative development techniques and good civic design and arrangement. . . .

For this reason, *N.J.S.A.* 40:55D–65(b) specifically states, in material part, that a zoning ordinance may:

Regulate the bulk, height, number of stories, orientation, and size of buildings and the other structures; lot sizes and dimensions; and for these purposes may specify floor area ratios and other ratios and regulatory techniques governing the intensity of land use and the provision of adequate light and air. . . .

■ A zoning ordinance may "accommodate aesthetic concerns," and the "[c]oncern with aesthetics" is subsumed within the purposes enumerated in *N.J.S.A.* 40:55D–2(c) and –2(i). *State v. Miller*, 83 *N.J.* 402, 409–10, 416 *A.*2d 821 (1980). The "consideration of aesthetics" in municipal land use law and planning is frequently termed "aesthetic zoning." *Id.* at 409–11, 416 *A.*2d 821. The Supreme Court has observed that "aesthetic qualities are best maintained through the use, *inter alia*, of lot size, setbacks, side yards, lot coverage ratios, topographical and landscaping requirements." *Home Builders League of South Jersey, Inc. v. Berlin Tp.*, 81 *N.J.* 127, 145–46, 405 *A.*2d 381 (1979).

■ While "aesthetics is certainly a legitimate aim of zoning," it is an aim that "must be accomplished within clearly defined limits." This is not always easy because the "question of aesthet-

ics is both abstract and subjective." *Diller & Fisher Co. v. Architectural Review Bd. of Bor. of Stone Harbor,* 246 *N.J.Super.* 362, 371–73, 587 *A.*2d 674 (Law Div.1990). Because of this, legislative attempts to "quantify" the concept of aesthetics and to establish "standards" can be, at best, "irksome." *Id.* at 373; 587 *A.*2d 674.

A court must decide not only whether a proper legislative goal is sought by the zoning ordinance, but also whether that goal is "achieved in a manner reasonably related to that goal." The means used to attain the legislative end must be reasonably related to it. *Home Builders League, supra,* 81 *N.J.* at 138–39, 405 *A.*2d 381. The ordinance "must comport with constitutional constraints on the zoning power, including those pertaining to due process." *Riggs, supra,* 109 *N.J.* at 611, 538 *A.*2d 808. In determining the validity of a zoning ordinance, the question is not whether the ordinance will accomplish its goal in every circumstance, but whether there are conceivable circumstances under which it will accomplish its goal. *Zilinsky v. Zoning Bd. of Adj. of Verona,* 105 *N.J.* 363, 368, 521 *A.*2d 841 (1987). If the rational relationship between the means chosen to achieve the legitimate zoning purpose is "at least debatable," the ordinance must be sustained. *Id.* at 369, 521 *A.*2d 841.

After correctly noting that "the purpose of Article Seven, Section 711, Note 4 was to maximize the appearance of open spaces," the judge invalidated the "method of determining the front lot line projection," because it bore no real and substantial relationship "to the *amount* of open space present, and to the *actual* length of the building." We disagree to an extent with the judge's reasoning. Because the purpose of Note 4 is to maximize the appearance of open space around a building, Note 4 is not concerned with the amount of actual open space around the building or with the actual length of the building. The building itself does not change size and will always conform to the maximum lot coverage requirement. Note 4 is only concerned with the perceived length of the building as "projected on the front lot line." If the "building

projection" on the front lot line "exceeds 90 feet," the enhanced setback requirements of Note 4 are triggered.

The judge also observed that "there appears to be no real and substantial nexus between the front lot line projection and the amount of open space upon a piece of property." This is true, but not particularly relevant because the purpose of Note 4 is to "maximize the appearance of open spaces," especially from the street, of developed property, not to increase "the amount of open space upon a piece of property."

The judge concluded "only that the method of determining the front lot line projection, which triggers Article 7, Section 711, Note 4, is invalid," because it bore no real and substantial relationship "to the desire for open spaces," or "to the amount of open space present, and to the actual length of the building." Again, this proposition is basically true, but not particularly relevant because the purpose of Note 4 is only to maximize the appearance of open spaces.

The judge was correct in his ultimate conclusion that the "method of determining the front line projection" is invalid. Note 4 is invalid because it is "impermissibly vague and ambiguous." Note 4 itself "provides no definitions, standards or criteria for calculating a 'projection' on a 'front lot line'." The balance of the ordinance is no more helpful in this respect.

■ A zoning ordinance must meet the "test of certainty and definiteness." *Morristown Road Associates v. Mayor and Common Council and Planning Bd. of Borough of Bernardsville*, 163 *N.J.Super.* 58, 67, 394 *A.*2d 157 (Law Div.1978). If the ordinance fails this test, it must be "invalidated as impermissibly vague and indefinite." *Id.* at 68, 394 *A.*2d 157. *See J.D. Construction Corp. v. Board of Adj. of Freehold Tp.*, 119 *N.J.Super.* 140, 149–50, 290 *A.*2d 452 (Law Div.1972) ("zoning ordinance must be clear and explicit in its terms, setting forth adequate standards to prevent arbitrary and indiscriminate interpretation and application by local officials"; zoning ordinance must be invalidated if "requirement[s]

of clear terms and adequate standards" not met). *See also Lionshead Woods Corp. v. Kaplan Brothers*, 250 *N.J.Super.* 545, 548–51, 595 *A.*2d 568 (Law Div.1991) ("law is well settled that a zoning ordinance must be clear and explicit in its terms, setting forth sufficient standards to prevent arbitrary and indiscriminate interpretation or application by local officials"). In *Lionshead Woods* the ordinance "did not specify" the procedure to be used in determining the number of permitted midrise units and allowed local zoning officials to "indiscriminately" devise their own procedure. The ordinance was held "impermissibly vague because it lacks clear standards to guide either an applicant for development or the local officials who must administer it." *Id.*

Lack of definition and standards for application is the basic problem with Note 4. As noted, the zoning ordinance does not define any of the material terms used in Note 4:(a) "length of the principal building," (b) "projected," (c) "front lot line," and (d) "building projection." No objective and precise method for determining the front lot line projection is set out in Note 4, or anywhere else in the ordinance. The method or methods of determination used by defendant's local engineer or zoning officials, though presumably in good faith, are simply methods formulated by those officials based on their "common sense" and their "trial and error."

Defendant retorts that the "terms contained in the Colts Neck Ordinance ... are completely clear," because the "calculations necessary for applying Note 4 are done in consistent fashion by a set procedure" formulated "by the Township Engineer." This does not render the "provisions of Note 4" completely clear. Somewhat inconsistently, defendant also contends that there is a "set method" in Note 4, in that there are "explicit provisions in the ordinance which tells the official how the measurement [on the front lot line] is to be done." The township engineer, however, testified to the contrary and we find no such provisions in the ordinance.

Because there is *no* "method of determining the front lot line projection" *in* Note 4, we agree with the judge's ultimate conclusion that the "method of determining the front lot line projection, which triggers Article 7, Section 711, Note 4, is invalid." We make no suggestion that defendant is forbidden from regulating the perception of an oversized improvement by use of an enhanced front setback requirement. The defendant may rationally require that the longer the building is, as perceived from the street, the deeper the front yard must be. But the ordinance so commanding must be in clear terms, either by precise definition or common understanding, and set forth an objective and uniform method of calculating the setback required. The municipality cannot simply leave the entire process in the hands of its agents, no matter how well intentioned.

There is nothing improper about municipal concern with aesthetics. "Creation of a desirable visual environment is a zoning purpose specified by *N.J.S.A.* 40:55D–2(i) ['to promote desirable visual environment through creative development techniques and good civic design and arrangements'] and municipalities have ample authority under the MLUL to work toward that purpose." *Cox, New Jersey Zoning & Land Use Administration* § 34–8.6 (1996). But municipalities must do so with reasonable precision and without blanket delegation.

## IV.

Finally, defendant contends that plaintiff "should not have been permitted to challenge the constitutionality" of Note 4 "since the challenge was well beyond the statute of limitations" and the judge erred in "holding that the time restriction for bringing an action in lieu of prerogative writs should be relaxed in this case." We disagree.

Note 4 was adopted on October 2, 1990; plaintiff filed his complaint in lieu of prerogative writs on April 7, 1994, over three years later. However, this action was filed within 45 days of the date the Board's ruling under Note 4 affecting plaintiff's property

became final. In general, no action in lieu of prerogative writs "shall be commenced later than 45 days after the accrual of the right to the review, hearing or relief claimed." *R.* 4:69–6(a). The court may enlarge this time period "where it is manifest that the interest of justice so requires." *R.* 4:69–6(c). The judge here so found, saying:

> Moving briefly to defendant's contention that this court not reach the constitutional question posed, as such is time barred. *Rule* 4:69–6(c) provides for enlargement of the 45 day time period where "it is manifest that the interest of justice so requires." The within matter requires the time limit to be enlarged, as the issue before this Court affects all properties located within the A–1, A–2, A–3 and AG zones of the township.

*R.* 4:69–6(c) (formerly *R.R.* 4:88–15(c)) was "merely an attempt to restate[,] in the form of a generalized standard, decisional exceptions which had already been engrafted upon the rule." *Schack v. Trimble,* 28 *N.J.* 40, 48, 145 *A.*2d 1 (1958). These implicitly included exceptions "included cases involving (1) important and novel constitutional questions; (2) informal or *ex parte* determinations of legal questions by administrative officials; and (3) important public rather than private interests which require adjudication or clarification." *Brunetti v. Borough of New Milford,* 68 *N.J.* 576, 586–87, 350 *A.*2d 19 (1975). *Accord Reilly v. Brice,* 109 *N.J.* 555, 558, 538 *A.*2d 362 (1988).

Cases decided subsequent to the adoption of paragraph (c) in 1957 "confirm that consideration of substantial constitutional questions warrants relaxation of the time limits of *R.* 4:69–6 'in the interest of justice.'" *Brunetti, supra,* 68 *N.J.* at 587, 350 *A.*2d 19. *See Catalano v. Pemberton Tp. Bd. of Adj.,* 60 *N.J.Super.* 82, 96, 158 *A.*2d 403 (App.Div.1960) ("even prior to the amendment of the rule by *R.R.* 4:88–15(c), it was recognized that cases in which *ultra vires* acts, or acts affecting the constitutional rights of a plaintiff, were found to exist were not barred by the time limitation in the rule"). *See also Ballantyne House Associates v. Newark,* 269 *N.J.Super.* 322, 330, 635 *A.*2d 551 (App.Div.1993) ("Actions in lieu of prerogative writs challenging the constitutionality of municipal ordinances have long been afforded the benefit of such enlargements of time.").

We find defendant's untimeliness contention clearly without merit.

Affirmed.