BOW AND ARROW MANOR, INC., A CORPORATION, HARRY KNOWLES, JR. AND DORIS KNOWLES, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. THE TOWN OF WEST ORANGE, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT, AND LOUIS P. FALCONE, DEFENDANT.

WEST ORANGE RIDING CLUB, INC., A CORPORATION, PLAINTIFF-RESPONDENT, v. THE TOWN OF WEST ORANGE, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT, AND LOUIS P. FALCONE, MAYOR, DEFENDANT.

MOTOR CLUB OF AMERICA, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. THE TOWN OF WEST ORANGE, A MUNICIPAL CORPORATION, DEFENDANT-APPELLANT.

Argued May 22, 1973—Decided July 5, 1973.

338

*Mr. Joseph G. Dooley, Jr.* argued the cause for defendant-appellant, Town of West Orange (*Mr. Harry A. Margolis,* attorney; *Mr. Vincent M. Mangino* on the brief).

*Mr. Ronald Reichstein* argued the cause for plaintiffs-respondents, Bow & Arrow Manor, Inc., Harry Knowles, Jr. and Doris Knowles (*Messrs. Beck, Reichstein and Guidone,* attorneys).

*Mr. Samuel B. Lesser* argued the cause for plaintiff-respondent, Motor Club of America (*Messrs. Meyers and Lesser*, attorneys).

*Mr. Seymour Rudenstein* argued the cause for plaintiffs-respondents, Barkley F. Eckert and Christine Eckert (*Messrs. Mellinger & Rudenstein*, attorneys).

*Mr. Herman W. Kapp* argued the cause for plaintiffs-respondents, Suburban Essex Riding Club and 12-22 Woodland Avenue Corporation (*Messrs. Kapp & Finkel*, attorneys).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. The Appellate Division affirmed, for the reasons given by the trial court, a holding by the Law Division that the 1969 zoning ordinance of West Orange was unconstitutional as arbitrary and unreasonable in its restrictions as to permitted uses of properties owned by the four plaintiff ownership interests, each of which had brought an action in lieu of prerogative writs attacking the validity of the ordinance. We granted certification. 63 *N. J.* 245 (1973).

Three of the plaintiff proprietary interests, which for convenience we denominate respectively as the Manor, the Riding Club and the Eckerts, have a common zoning situation somewhat different from that of the fourth plaintiff, Motor Club of America (MCA). The properties of those three are, and since the original 1929 zoning ordinance of the town always have been, zoned for one-family residential use. But each is used, in whole or in part, for a long existing nonconforming or variance non-residential use.

The Manor is the site of a very large restaurant on a nine-acre parcel; the Riding Club comprises a substantial plant for recreational horse riding and allied activities; and the Eckerts' property is the site of a small wood and fence business as well as three residences. These properties (except for Riding Club, which is west of Eckerts') are situated on

the westerly side of Prospect Avenue, a major north-south county road, more or less close to the T-intersection of Woodland Avenue (an east-west street) with Prospect Avenue. That intersection is about a half-mile north of the major street intersection of Prospect Avenue and Eagle Rock Avenue, three of the four corners of which, together with their immediate proximate areas, are devoted to substantial non-residential uses. The most prominent of these is a large Korvette Shopping Center of about 37 acres on the northwest corner of the said intersection, established about 1962. The Korvette tract includes a bank and a separate automotive supply store.

The MCA property is a 9½ acre tract of vacant land with about 350 feet of frontage on the westerly side of Prospect Avenue and 1,100 feet in depth, immediately north of the Korvette parcel. The Prospect Avenue frontage of MCA, along with a roughly similar tract north of it owned by Kruvant (not a party), is zoned O-R, which is basically restricted, so far as commercial use is concerned, to 2½ story (not over 35 feet high) office building or research laboratory uses. The rear 150 feet of MCA is zoned residential, similar to the general area to the west.

The MCA-Kruvant parcels are bounded on the north by Nicholas Avenue, part of which, for some distance west of Prospect Avenue, is a paper street. The Riding Club and Eckert properties lie between Nicholas Avenue and Woodland Avenue, the former fronting on Woodland. Woodland Avenue is a moderate-traffic, east-west street running from Prospect Avenue to Pleasant Valley Way, a major north-south road about 3/4 mile to the west. Except for the Riding Club all of the territory abutting Woodland Avenue, and all near it except Eckerts' and Manor, is developed exclusively for moderate sized, attractive one-family residences. This resi-dential development includes all the area abutting and west of the Manor. An elementary school stands in the center of this residential section. The area west of Kruvant, MCA

and Korvette is all zoned residential but as yet is largely undeveloped.

West Orange is predominantly a single-family residential community, characterized by neighborhood shopping areas, some golf courses and public parklands, and a few small two-family residential and industrial sections. The area in dispute in this case is in the north-central part of the town.

The entirety of the lands fronting on the easterly side of Prospect Avenue from Eagle Rock Avenue to well north of all of the properties here involved consists of the South Mountain Reservation maintained as undeveloped parkland by the Essex County Park Commission. North of the Manor property on the west side of Prospect Avenue is the golf course of the Montclair Golf Club. North of that to the nearby Verona city line, and beyond, there is one-family residential development on both sides of Prospect Avenue.

Prospect Avenue at the location of the subject properties is a two-lane, very heavily trafficked thoroughfare, with dangerous bends in the road. The intersection of Prospect and Eagle Rock Avenues becomes clogged during rush hours and over weekends. Essex County has been trying to interest the State in taking over Prospect Avenue and widening it to four lanes. This will become particularly vital with the impending opening of an exit onto Prospect Avenue, a half mile south of Eagle Rock Avenue, from the recently completed Interstate Highway 280.

The topography of all the subject properties is characterized by a more or less gradual but substantial decline in a westerly direction, from the level of Prospect Avenue, reaching a low point of 50-60 feet below Prospect Avenue at the westerly portion of the MCA tract. This condition, coupled with Prospect Avenue traffic density, renders difficult the emergence of vehicles from Woodland Avenue and from private driveways onto Prospect Avenue.

## I. *Background of the 1969 Zoning.*

West Orange engaged the planning firm of Robert Catlin and Associates in 1963 to consult with the Planning Board in the preparation of a comprehensive master plan for the town. Russell L. Montney, a professional planner, was in charge of the work for Catlin. This project led to the adoption of a comprehensive master plan by the Board in June 1966. The plan recommended, among many other things, that the Manor, Eckert and Riding Club properties be devoted to "commercial and non-residential special uses," but that was contrary to Montney's views as to the latter two properties because of the traffic situation at the intersection of Woodland and Prospect Avenues, and, as to the Manor, because this would constitute spot zoning.[1]

The master plan made a similar use recommendation as to MCA, in which Montney concurred at the time, but he testified that he ultimately agreed that the O-R district was appropriate zoning for the MCA parcel. However, a September 1969 memo from the Planning Board to the Council suggested an OB-2 district for MCA (8-story Office Building, private or public, with accessory retail use). Montney also testified that the residential zoning of the MCA rear was sound in view of the residential zoning immediately to the west.

The town council gave the matter of revision of zoning for the municipality as a whole extended study and consideration from June 1966 until the adoption of the subject ordinance on December 16, 1969, meeting with Montney and other officials and representatives of the public many times

---

[1]At the trial Montney gave it as his expert opinion that these three properties should remain zoned residential since they were actually being put to productive uses and a broad commercial use classification was undesirable: (1) until there was a "solution" to the traffic problem; (2) because of adverse effect on nearby residential areas, particularly as to the Riding Club; and (3) there were adequate shopping and service facilities elsewhere for the residents in the vicinity.

toward that end. In December 1968 the Council submitted to the public a tentative land use map. This showed MCA in an O-R district, the main Manor parcel in a B-2 district (permitting retail store operations), and Eckerts and Riding Club in a residential district. Submissions for changes were received from miscellaneous sources, including property owners and the Planning Board. After a year of consideration by the Council (there was much debate and dissension over features of the zone use plan not here involved), the subject ordinance was adopted by the Council over the veto of the Mayor.

## II. *The Issues.*

■■ It is fundamental that zoning is a municipal legislative function, beyond the purview of interference by the courts unless an ordinance is seen in whole or in application to any particular property to be clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the statute. *N. J. S. A.* 40:55–31, 32. It is commonplace in municipal planning and zoning that there is frequently, and certainly here, a variety of possible zoning plans, districts, boundaries, and use restriction classifications, any of which would represent a defensible exercise of the municipal legislative judgment. It is not the function of the court to rewrite or annul a particular zoning scheme duly adopted by a governing body merely because the court would have done it differently or because the preponderance of the weight of the expert testimony adduced at a trial is at variance with the local legislative judgment. If the latter is at least debatable it is to be sustained. *Kozesnik v. Montgomery Twp.,* 24 *N. J.* 154, 167 (1957); *Vickers v. Tp. Com. of Gloucester Tp.,* 37 *N. J.* 232, 242 (1962), *cert.* den. and app. dism., 371 *U. S.* 233, 83 S. Ct. 326, 9 *L. Ed.* 2d 495 (1963). The correctness of the striking by the trial and appellate courts of the present ordinance in respect of the four subject properties must be appraised in the light of these principles.

The basic holding of the Law Division, approved by the Appellate Division, was that the heavily commercial nature of the Korvette use and the variety of commercial uses permitted at that location under the P-C zone of the ordinance, together with the attendant traffic and topographical conditions, rendered all properties on the continuation of Prospect Avenue north of Korvette to the Montclair Golf Club not reasonably classifiable for residential zoning. There was considerable expert testimony to support those conclusions. There was, on the other hand, testimony by two of the councilmen, supported by Mr. Montney, indicating in effect that the governing body regarded Korvette, the MCA-Kruvant area, and the Eckerts-Riding Club-Manor area taken more or less as a unit, as involving differing zoning characteristics and requiring consideration of their varying effects on surrounding properties.

In the view of the governing body, the Korvette property was the center of a commercial concentration at the Prospect-Eagle Rock intersection. MCA-Kruvant was intermediate in that it was closer to the residential development north and northwest and could serve as a "transitional" or buffer zone through uses of a non-residential nature but less abrasive on adjacent residential areas and values than broad. commercial zoning. Eckerts, Riding Club and Manor, although not highly desirable as residential sites, to some extent because of Prospect Avenue traffic, should, it was thought, nevertheless be regarded as integral with the exclusively residential area surrounding and interpenetrating them because they were at least marginally developable (should the nonconforming uses disappear) for residences and to protect the existing residential development from the harmful influence of adjacent, broad-range commercial operations, including retail stores and services. Supporting considerations were the effects of adding intensive commercial uses on Prospect Avenue on the heavy and growing traffic load of that road and the consequent advisability of awaiting the hoped-for widening and improvement of the street before deciding on a change of its

zoning;[2] and also the apparent adequacy of relatively close retail and service facilities for neighborhood residents. These justifications for continuation of the Prospect Avenue residential zoning were also extensively supported by expert proof adduced on behalf of the town.

### III. General Conclusions.

We deal first with the general approach of the courts below, taking up later such considerations as are peculiar to the individual properties involved.

 We are satisfied, without here detailing all of the extensive proofs, that the basic determination under appeal was in error because not giving due deference to the local legislative judgment in the matter. The situation presented does not mandate that all the Prospect Avenue frontage (much less the Riding Club) be zoned for general commercial uses or that residential zoning for that segment thereof north of Kruvant be proscribed. What we have here is a fairly disputable area where commercial influences converge with residential ones. The legislative judgment could reasonably go either way. It is for the governing body to decide the boundary lines for adjoining districts of discordant character. 1 Rathkopf, The Law of Zoning and Planning (1972), pp. 13–1 to 13–6; Finn v. Wayne Tp., 53 N. J. Super. 405, 413 (App. Div. 1959). Lessened desirability for residences of a particular area may legitimately be counter-balanced by potential harm to an adjacent fully developed residential area where both territorial segments form a natural zoning district as an entirety. Were it not for the three nonconforming uses of Eckerts, Riding Club and Manor the case for the existing zoning would be quite strong, particularly in the light of the permanent parklands on the east side of Prospect Avenue, and notwithstanding the adverse influence of the

---

[2]The Master Plan stated a "need for additional study of the Prospect Avenue area in the future."

heavy traffic and the less than ideal topography. However the incidence of a few nonconforming non-residential uses in an otherwise predominantly residential area, while a proper factor for consideration, is by no means controlling where substantial considerations point to retention of residential zoning, as here they do. The zoning objective under *N. J. S. A.* 40:55–32 is not necessarily "to encourage the most appropriate use of *plaintiff's property*" but rather to consider, among other things, " 'the character of the district and its peculiar suitability for particular uses, and with a view of conserving the value of property and encouraging the most appropriate use of land *throughout such municipality'.*" *Cobble Close Farm v. Bd. of Adjustment, Middletown Tp.,* 10 *N. J.* 442, 452–453 (1952) (emphasis by the court). It is implicit in this principle that it is appropriate for West Orange, in zoning Prospect Avenue frontage, to consider its character, value and utility in conjunction with those features of the area to the west and the effect that the use-zoning of each related segment may exert upon the other.

■ Nor is the possible effect of more intensive utilization of Prospect Avenue frontage upon an already overburdened highway beyond the scope of proper zoning considerations, balanced of course by other relevant factors. "To lessen congestion in the streets" is the first of the zoning purposes listed in *N. J. S. A.* 40:55–32. *Cf. Bogert v. Washington Twp.,* 25 *N. J.* 57, 65 (1957); *Wilson v. Mountainside,* 42 *N. J.* 426, 450 (1964) (warning against the use of completely unfeasible residential zoning as a means of controlling highway use problems through the variance procedure).

■ Plaintiffs are not correct in arguing that the failure of the Council to adhere to the recommendations of the Master Plan as to the Prospect Avenue area indicates the absence of zoning in accordance with a comprehensive plan, as required by *N. J. S. A.* 40:55–32. The governing body is not bound by the master plan adopted by a planning board. The ordinance itself may reflect a comprehensive plan, and we find that here it does. *Ward v. Montgomery Tp.,* 28 *N. J.* 529,

536 (1959); *Johnson v. Township of Montville,* 109 *N. J. Super.* 511, 520 (App. Div. 1970).

■ In summary, we conclude that the municipal decision not to zone MCA and the properties of the other plaintiffs on the same commercial basis as Korvette and to retain the preexisting residential zoning of Eckerts, Riding Club and Manor was free from unreasonableness or arbitrariness and *prima facie* valid.

We proceed to consider the special factors relative to the zoning of the properties of the individual plaintiff-interests.

## IV. *Manor.*

The main restaurant tract occupies 9.22 acres on Prospect Avenue and is improved by a sumptuous dining and party facility capable of catering to hundreds of people at a time, with ample parking space therefor. The owners have acquired two unimproved adjoining lot assemblages: one to the south with 400 feet of frontage on Prospect Avenue and a depth averaging 125 feet; and one to the north with an average width of 200 feet (fronting on Prospect Avenue) and a depth of 486 feet. There was conflicting expert evidence as to the feasibility of developing these north and south pieces, as well as the main tract if vacant, for residences. A restaurant has been situated on the main tract since 1930, but it has been greatly enlarged by variances granted after 1957.

■ A question, not argued before us, may well be germane in relation to any assertion by Manor that the ordinance is unconstitutional as to it alone, once the broader attack made upon the ordinance by the four plaintiffs collectively is rejected. It would seem that, as to the main tract, a contention of confiscation by ordinance could be argued to lack substance since the property is being permitted to be utilized productively by virtue of its nonconforming status and the variances. But we need not pursue that narrow approach to

the matter. We find the residential zoning of the main as well as the side tracts entirely valid on the basis of the considerations discussed above. In relation to the main tract, the municipality was entitled to envisage the consequences of broad commercial zoning of the property on the surrounding area in the event, however presently unlikely, that the existing nonconforming use might be abandoned. See 1 *Rathkopf, op. cit. supra* at 13–1.

## V. *Eckerts.*

The combined parcels here involved are on the southwesterly corner of Prospect and Woodland Avenues, with a frontage on Prospect of 315 feet and a depth along Woodland of 198 feet. In addition to the wood and fence business there are three residences on the tract. The business operation began with a variance in 1930. We find no basis whatever to support any claim that the zoning is invalid in its effect upon these properties.

## VI. *Riding Club.*

This property comprises 3.25 acres of land fronting on Woodland Avenue. The facilities of the business were erected about 1924 and were a nonconforming use in a residential zone under the original 1929 and later ordinances. The buildings consist of horse barns and stalls, an indoor riding ring and facilities for the storage of feed and equipment. Horse riders from the club's stables gain access to the trails on the Essex County Park Reservation on the other side of Prospect Avenue *via* an underpass beneath the road.

This parcel penetrates deeply into a developed residential area in and around Woodland Avenue adjacent to the Riding Club facilities. We find no foundation for the assertion that the residential zoning of the property operates upon it unconstitutionally.

## VII. *MCA*

This property presents more of a problem than the others as it is adjacent to Korvette, has a more substantial topographical disadvantage and is restricted to only a few practical uses under the ordinance.

We dismiss at the outset the complaint concerning the residential zoning of the rear 150 feet of the tract. The owner has no vested right that the entire 9½ acre tract be contained within a single use district. See *AMG Associates v. Springfield Tp.*, 123 *N. J. Super.* 295 (App. Div. 1973). The portion zoned residential abuts Terrace Avenue, a paper street the west side of which is also zoned residential, as is the general area westerly thereof. Although the existing residential development is sparse, no one asserts that such neighboring zoning is in any way inappropriate to the character of the area and its environs. It was therefore within reason for the governing body to zone the westerly portion of the MCA tract concordantly.

The owner of MCA is an insurance company which acquired the property in 1957 and spent a considerable sum partially filling it in, intending to erect a home office building thereon. The use restrictions at the time of purchase were similar to the present O-R zoning, except that the buildings could be three stories. The owner abandoned building plans when it found there was no public transportation to the property. The O-R zone allows only an office building, research laboratory, post office, or civic center limited to an assembly hall and non-commercial indoor recreational facilities. There may be an accessory restaurant or bar in the building. Height is restricted to 2½ stories and 35 feet. No structure may occupy more than 20% of the lot.

An officer of the owner testified that, inclusive of the expense of fill, the investment in the property was "close to $500,000" and that development of an office or research building under the zone restrictions would not yield an adequate return on the investment. He further opined that

the low ground level *vis a vis* Prospect Avenue made a 2½ story building particularly undesirable. Other experts testified in support of the argument of economic inutility, but only in conclusional terms. There was no detailed evidence concerning the rental yield which might be realized from the approximately 150,000 square feet of office or laboratory space which could be developed under the terms of the ordinance, and as to what the net return therefrom would be over expenses of operation and the cost of capital expended to acquire the property and to erect the building. The conclusions of MCA's experts were that only a six or eight story office building or a high rise apartment would produce a reasonable economic return to the owner.

The position of the town is that a structure of over 2½ stories would exert a baneful influence on adjacent residential areas. There was proof, however, that informal overtures had been made by municipal authorities to the owner tendering the possibility of a variance for a 4-story building but that this was not pursued by the owner.

We conclude that although a fairly close question as to the feasibility of the zone uses is presented, the doubt must be resolved in favor of the presumption of the validity of the zoning restriction, without prejudice, of course, to the possible availability of relief by application for variance. An owner is not entitled to have his property zoned for its most profitable use. The owner here has not sufficiently clearly demonstrated by proof the economic unfeasibility of utilization of the property within the zoning restrictions. See *Munoz Really Corp. v. Verona,* 93 *N. J. Super.* 232 (App. Div. 1966), aff'd o. b. 48 *N. J.* 360 (1966). It may or may not be able to do so by more specific and detailed proofs on a variance application; or it may possibly succeed on such an application on other grounds. In any event, that recourse should be required before the Court concludes, on the present showing, that the ordinance is confiscatory in relation to the property. *Cf. Deal Gardens, Inc. v. Bd. of Trustees of Loch Arbour,* 48 *N. J.* 492 (1967).

The judgment is reversed and the cause remanded for entry of a judgment dismissing the complaints.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, MOUNTAIN and SULLIVAN and Judges CONFORD and COLLESTER—7.

*For affirmance*—None.