882 A.2d 395 (2005)
380 N.J. Super. 336
Joseph BAILES, Anthony Bailes, Jane Bailes, Gerard Noebels, Elizabeth Noebels, John Bocra, Herb Heim, Barbara A. Foerter, Plaintiffs-Appellants, and
Erna Diem and Mabel Sigle, Plaintiffs,
v.
TOWNSHIP OF EAST BRUNSWICK, Defendant-Respondent, and
The Planning Board of the Township of East Brunswick, Defendant.
Iaria Family Trust, L.L.C., Olga Clark, Roman Clark, Jr., William Clark, Katherine Himich and Middlesex County Fair Association, Plaintiffs-Appellants,
v.
Township of East Brunswick, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 25, 2005.
Decided September 22, 2005.
*397 David J. Frizell, Metuchen, argued the cause for appellants (Frizell & Samuels, attorneys; Mr. Frizell, on the brief).
Gage Andretta, West Orange, argued the cause for respondent (Wolff & Samson, attorneys; Mr. Andretta and Maria K. Anastasia, on the brief).
Before Judges SKILLMAN, GRALL and RIVA.
The opinion of the court was delivered by
SKILLMAN, P.J.A.D.
Plaintiffs, owners of properties in the Township of East Brunswick, challenge the validity of zoning ordinances that downzoned the permitted densities in the district in which their properties are located from one unit per acre or per two acres to one unit per six acres, with cluster options ranging from one unit per three acres to one unit per three-and-a-half acres. We conclude that these ordinances are invalid as applied to plaintiffs' properties because the downzoning is not required to serve the stated purposes of the ordinances and does not reflect reasonable consideration of existing development in the areas where plaintiffs' properties are located.
East Brunswick is located in central Middlesex County. It consists of approximately 14,300 acres (twenty-two square miles). The municipality is traversed by the New Jersey Turnpike, running northeast to southwest, and by Route 18, running northwest to southeast.
*398 Due to its proximity to the Turnpike and Route 18, East Brunswick has experienced significant growth since World War II. The 2000 census recorded a population of 46,756, which translates to a density of approximately 2129 persons per square mile.
More than two-thirds of East Brunswick, located to the north of the district in which plaintiffs' properties are located, is densely populated and built-out close to full capacity. The predominant use in this area is single-family residences at densities of three units per acre. In addition, there is a significant amount of commercial and light industrial development and multiple family dwellings in the vicinity of Route 18.
The district in which plaintiffs' properties are located, which East Brunswick has designated as a rural preservation (RP) zone, is less densely developed than the rest of East Brunswick, with a population of only 507 persons per square mile. The RP zone is bisected into two distinct halves by the New Jersey Turnpike.
The section to the east of the Turnpike encompasses 1639 acres (2.5 square miles). In this section, 1110 acres are publicly-owned or in church use, approximately 140 acres are developed with residential, commercial or industrial uses, and approximately 360 acres (the properties owned by plaintiffs) are essentially undeveloped and under farmland assessment. The dominant land use in the eastern section of the district is Jamesburg Park, which covers more than 1050 acres. The land outside Jamesburg Park is relatively level and has few environmental constraints. The major roads crossing the eastern RP district include Cranbury Road, Dunhams Corner Road and Fern Road. Portions of Cranbury Road are four lanes wide and the master plan calls for this road to be widened to four lanes over its entire length.
The section of the RP zone to the west of the Turnpike encompasses 2680 acres (4.2 square miles). Farrington Lake, a source of potable water for surrounding communities, forms the western border of this section and several stream corridors form its other edges. In this section of the RP zone, approximately 800 acres are in public or charitable use; 600 acres are in agricultural use; approximately 790 acres are developed with residential, commercial or industrial uses; and approximately 600 acres are undeveloped. Most residences are on lots of less than one acre.
Until 1999, East Brunswick permitted residential and other development in what is now designated the RP district at substantially greater densities than are permitted under the ordinances challenged in this litigation. In 1976, the eastern section of the district was zoned primarily for neighborhood business and industrial-commercial uses. In 1980, most of this area was rezoned residential, with a permitted density of one unit per acre. A cluster option allowed development on half-acre lots with a 25% open space set-aside and a twenty acre minimum tract. A portion of the area belonging to plaintiff Olga Clark was rezoned to permit 15,000 square foot lots, with a permitted density of three units per acre.
In 1986, as part of a consent order settling exclusionary zoning litigation, a ninety-eight acre portion of one property, owned by Heavenly Farms, Inc., was designated as an optional contingency zone for the construction of affordable housing, with a permitted density of seven units per acre. However, after the Council on Affordable Housing (COAH) granted substantive certification to East Brunswick's affordable housing plan, East Brunswick repealed the ordinance creating this special zone.
*399 Prior to 1960, there was no zoning applicable to the western section of the RP zone. In 1976, East Brunswick zoned this area for residential use at a density of one unit per acre. In 1979, the municipality rezoned this area for a density of one unit per two acres. Cluster development, not to exceed five units per acre, was allowed as a conditional use.
In 1999, East Brunswick adopted the first of the series of ordinances challenged in this litigation. One ordinance merged the former separate zoning districts on the east and west sides of the Turnpike into a single RP district, and the second ordinance rezoned the newly constituted district for a density of one residential unit per six acres under conventional development, with cluster options discussed later in this opinion.
The adoption of these ordinances precipitated the filing of three actions in lieu of prerogative writs challenging their validity: one by Heavenly Farms, Inc., the owner of the largest parcel of undeveloped land on the east side of the Turnpike; a second by the owners of nearly all other undeveloped land in the eastern section; and the third by the owners of undeveloped land in the western section of the district. These actions were subsequently consolidated.
On plaintiffs' application, the trial court granted a preliminary injunction enjoining East Brunswick from enforcing these ordinances.
In 2001, the East Brunswick governing body adopted two new ordinances rezoning the RP district, which superseded the 1999 ordinances. These ordinances retained the six-acre zoning adopted in 1999 but increased the densities permitted under a number of cluster options. Cluster development at a density of one unit per three-and-one-half acres is permitted under these options, provided certain conditions are satisfied. Cluster development at a density of one unit per three acres is permitted if all open lands consist of prime agricultural soils and are dedicated to agriculture.
The trial court granted plaintiffs' motions to file amended complaints challenging the 2001 ordinances. After the completion of discovery, the case was tried over five days. During the trial, East Brunswick and Heavenly Farms entered into a settlement that dismissed the Heavenly Farms' complaint, subject to East Brunswick's purchase of its property.[1]
Paul Phillips testified at trial as a land use planning expert on behalf of the plaintiffs who own properties on the east side of the Turnpike. Phillips described this section of the RP district as a mixed-use area with relatively intense development. He noted that the ordinances downzoning plaintiffs' properties list five purposes: protection of natural resources; maintenance of farmland; preservation of rural character; preservation of open space; and respect for the carrying capacity of the land. Phillips concluded that the ordinances would not reasonably achieve any of these goals.
Concerning protection of natural resources, Phillips stated that the eastern section of the RP district has no wetlands or floodplains, other than those near Ireland's Brook. Most wetlands lie outside of plaintiffs' properties in an area recently developed with single-family homes. There are few woodlands or topographic constraints, and the seasonal high water *400 table depth is greater than six feet. For these reasons, Phillips concluded that the plaintiffs' properties on the east side of the Turnpike are suitable for residential development.
Phillips testified that there is no rural character left to preserve east of the Turnpike. He described the eastern RP zone as a growing suburbanized area and the area where plaintiffs' properties are located as an "isolated doughnut" surrounded on all sides by intense residential development, much of it on lots of only 15,000 square feet. There also is some multi-family housing, offices and commercial development along Cranbury Road near plaintiffs' properties.
Phillips acknowledged that the downzoning of plaintiffs' properties would create open space but expressed the opinion that the cluster options' set-aside requirements were unreasonable. Moreover, he concluded that the cluster density and open space set-asides were mathematically unachievable: according to Phillips, the minimum density that would be added under the cluster options would be closer to one unit per four or five acres than the one unit per three-and-a-half acres allowed by the ordinance.
Phillips explained that an area's carrying capacity relates to its ability to accommodate septic systems and to recharge underlying aquifers. Relying on the Middlesex County Soil Survey, Phillips stated that most of plaintiffs' land is suitable for septic systems, with only a small area along Ireland's Brook considered unsuitable. He pointed out that regulations promulgated by the Department of Environmental Protection (DEP) establish the lot size required to accommodate a septic system based on the soils underlying a property. Nothing in the DEP regulations supports the imposition of a six-acre minimum lot size based on septic system concerns. Moreover, there are sewer lines under the streets in front of plaintiffs' properties.
Phillips testified that the area where plaintiffs' properties are located is an area of moderate to high aquifer recharge potential. However, the methods for protecting aquifers in high recharge areas involve limitations on lot coverage and the establishment of stream corridor buffers, not the institution of large lot zoning. Phillips pointed out that the Middlesex County standard for protecting aquifer recharge in residential areas is a maximum lot coverage of 20%, which can be achieved on one-acre lots.
Phillips concluded that the 1999 downzoning of the eastern section of RP zone, as modified in 2001, is unreasonable because it reflects no consideration of the character of the zone or its development dynamics; bears no relationship to the area's actual physical and environmental qualities; and establishes no nexus between its goals and the results it would be likely to achieve. Therefore, the downzoning places an inequitable burden on landowners who have continued to farm, while rewarding landowners who quickly sold their land for development.
Richard M. Preiss testified as a planning expert on behalf of the plaintiffs who own properties on the west side of the Turnpike. He stated that land uses in this area include residential development, farmland, public parks, open space, and limited commercial development. The predominant lot size is less than six acres. Preiss testified that after eliminating land that is already developed, environmentally constrained, or under deed restriction, only about 800 of the 2680 acres west of the Turnpike are capable of further development.
Preiss stated that the downzoning from one lot per two acres to one lot per six *401 acres disadvantages landowners whose properties have few environmental constraints, while benefiting landowners with environmentally sensitive sites. This is because the developable portion of a site was divided into two-acre lots and no credit was given for wetlands or floodplains under the old zoning. However, under the new zoning's cluster options, wetlands can be applied to the open land set-aside. Consequently, if a property is more than 60% environmentally constrained, it would be possible to build more units under the new zoning than under the old.
Preiss also testified that farmland preservation was not an appropriate goal for the western section of the RP zone. At the time of trial, only about one-quarter of the remaining land was actually being farmed. Development applications that had been approved or were then pending would eliminate about half of the acres in agricultural use. None of the plaintiffs' sites is located in a designated agricultural development area and few contain prime agricultural soils. Furthermore, the average size of farms targeted for agricultural development in Middlesex County is 130 acres, but the largest of plaintiffs' properties is approximately 30 acres.
Preiss testified that the western RP zone is devoid of sensitive environmental conditions that warrant six-acre zoning. According to East Brunswick's 1996 "Natural Resource Inventory" study, the majority of the plaintiffs' properties are in areas of moderate or slight septic limitations. Only the Joseph Bailes property has large areas of severe septic system limitations. However, even in areas of severe septic limitations, the DEP regulations only require lots of about two acres for septic systems.
Preiss echoed Phillips's conclusion that placing the burden of providing public open space on a few property owners is inequitable. He stated that the costs of open space preservation should be borne by the entire community and not solely by farmers who have maintained their farms in the face of encroaching development.
Francis J. Banisch testified on behalf of East Brunswick as a planning expert. His firm prepared the reports that recommended the downzoning of the RP zone to one residential unit per six acres. Banisch stated that it is difficult to lump all of plaintiffs' properties into a single category with respect to septic suitability. Some of the properties are entirely suitable for septic, while others are unsuitable.
Banisch testified that open space in close proximity to intensely developed areas is associated with a good quality of life. He expressed the belief that six-acre zoning or cluster options with large open land ratios are better ways to retain agricultural land and open space than one- or two-acre zoning.
Banisch recognized that the State Plan has an equity policy that seeks to balance the impact of preservation strategies on individual landowners with the impact of such strategies on the community. He admitted that the full burden of implementing the State Plan should not be "dumped at the doorstep of the private landowner," but reasoned that "when we make marginal adjustments in density and come up with multi-variant approaches to permit all kinds of different ways of using the lands and getting equity value back out, that's very different than just taking away development rights."
The trial court concluded in a written decision that the 2001 ordinances rezoning the area in which plaintiffs' properties are located are valid and dismissed plaintiffs' complaints. The court did not make express credibility findings regarding the testimony of plaintiffs' and East Brunswick's *402 planning experts. The court also failed to make express findings regarding the factual issues addressed by the experts, such as the existence of environmental constraints on development or the economic feasibility of farming on plaintiffs' properties. The court simply stated:
There is clearly a difference of opinion among the experts as to whether the character of the area is rural or suburban. Such differences, so long as supportable, must be resolved in favor of the municipality. The Township is attempting to control sprawl and at the same time attempting to maintain a rural character to the area thereby preserving farmland and open space. The Township's position is ably supported by the record.
Plaintiffs filed a single notice of appeal from the dismissal of their complaints.[2]
We conclude that as applied to the plaintiffs' properties, the RP district's restriction of development to one unit per six acres is not required to serve the stated purposes of the ordinances and does not reasonably conform with the character of existing development in the area and is therefore arbitrary and unreasonable. Due to the absence of essential fact-finding in the trial court's opinion, we have made such findings of fact as are necessary to bring this litigation to a conclusion. R. 2:10-5; see Odabash v. Mayor of Borough of Dumont, 65 N.J. 115, 123, 319 A.2d 712 (1974). Because we conclude that the 2001 ordinances downzoning the RP district are invalid as applied to plaintiffs' properties, there is no need to consider plaintiffs' argument that the trial court erred in excluding from evidence certain documents relating to East Brunswick's purchase of the Heavenly Farms' property.

I
Under the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -163, a zoning ordinance must be "drawn with reasonable consideration to the character of each district and its peculiar suitability for particular uses and to encourage the most appropriate use of land." N.J.S.A. 40:55D-62. In addition, the zoning must be "uniform throughout each district for each class or kind of buildings or other structures or uses of land." Ibid.
A zoning ordinance is entitled to a "strong presumption of validity." Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 289, 777 A.2d 334 (2001), cert. denied, 535 U.S. 1077, 122 S.Ct. 1959, 152 L.Ed.2d 1020 (2002). However, a property owner may overcome this presumption by showing that the ordinance "is `clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the [zoning] statute.'" Id. at 290, 777 A.2d 334 (quoting Bow & Arrow Manor, Inc. v. Town of West Orange, 63 N.J. 335, 343, 307 A.2d 563 (1973)). This showing may be made with respect to the facial validity of a zoning ordinance, see Home Builders League of S. Jersey, Inc. v. Twp. of Berlin, 81 N.J. 127, 405 A.2d 381 (1979), or its application to particular properties, see Pheasant Bridge, supra, 169 N.J. at 289-90, 777 A.2d 334; Odabash, supra, 65 N.J. at 125, 319 A.2d 712. Ultimately, the question in any challenge to the validity of a zoning ordinance "is whether the requirements of the ordinance are reasonable under the circumstances." Pheasant Bridge, supra, 169 N.J. at 290, 777 A.2d 334 (quoting Vickers v. Twp. Committee of Gloucester Twp., 37 N.J. *403 232, 245, 181 A.2d 129 (1962), appeal dism. and cert. denied, 371 U.S. 233, 83 S.Ct. 326, 9 L.Ed.2d 495 (1963)); see also Rumson Estates, Inc. v. Mayor of Borough of Fair Haven, 177 N.J. 338, 358-59, 828 A.2d 317 (2003).
In determining a zoning ordinance's reasonableness, a court must consider "the relationship between the means and ends of the ordinance." Pheasant Bridge, supra, 169 N.J. at 290, 777 A.2d 334. As the Court explained:
[T]he means selected must have real and substantial relation to the object sought to be attained, and the regulation or proscription must be reasonably calculated to meet the evil and not exceed the public need or substantially affect uses which do not partake of the offensive character of those which cause the problem sought to be ameliorated.
[Ibid. (quoting Kirsch Holding Co. v. Borough of Manasquan, 59 N.J. 241, 251, 281 A.2d 513 (1971)).]
See also Home Builders League of S. Jersey, supra, 81 N.J. at 138, 405 A.2d 381.
In making this determination, a court should consider the history of zoning in the district and existing patterns of development. See Pheasant Bridge, supra, 169 N.J. at 293-95, 777 A.2d 334; Odabash, supra, 65 N.J. at 123-25, 319 A.2d 712. Such a determination "depend[s] upon the peculiar facts in each case." Id. at 123-25, 319 A.2d 712. Therefore, to determine whether an ordinance is valid as applied to a particular property, a court must consider whether the purposes sought to be accomplished by the ordinance justify the restrictions placed on the use of that property. Pheasant Bridge, supra, 169 N.J. at 293, 777 A.2d 334.
East Brunswick argues that the 2001 zoning ordinances must be upheld because they advance various purposes of the MLUL. However, even if a zoning ordinance advances one or more purposes of the MLUL, the ordinance will be invalidated if the restrictions it imposes on the use of land are not "reasonably related to those purposes" or "conflict[] with other purposes of the MLUL." Sartoga v. Borough of W. Paterson, 346 N.J.Super. 569, 579, 788 A.2d 841 (App.Div.), certif. denied, 172 N.J. 357, 798 A.2d 1270 (2002).
We conclude that East Brunswick has not shown that the limitation of development to one unit per six acres or, where a cluster option may be utilized, one unit per three or three-and-a-half acres, is required to serve the stated purposes of the 2001 zoning ordinances  recognition of environmental constraints, retention of farmland and conservation of open space  at least as applied to plaintiffs' properties. We also conclude that this severe downzoning of plaintiffs' properties does not reflect "reasonable consideration [of] the character" of the areas surrounding plaintiffs' properties and therefore violates N.J.S.A. 40:55D-62(a).
We first discuss the evidence relating to whether the 2001 ordinances serve their stated purposes. We then consider the impact upon plaintiffs' individual properties of the downzoning provided under those ordinances in light of existing development in surrounding areas.

II
Although there are constraints on development, such as flood plains and wetlands, on some parts of plaintiffs' properties, the zoning provided under the 2001 ordinances is not required to prevent environmental damage to those areas. Instead, the permitting and certification requirements of the Freshwater Wetlands Protection Act, N.J.S.A. 13:9B-1 to -30, and Flood Hazard *404 Area Control Act, N.J.S.A. 58:16A-50 to -101, and the regulations adopted thereunder, N.J.A.C. 7:7A-1.1 to -17.1; N.J.A.C. 7:13-1.1 to -7.1; N.J.A.C. 7:15-1.1 to -9.8, provide adequate assurance that development at one unit per one or two acres will not result in incursion into environmentally sensitive areas. See Pheasant Bridge, supra, 169 N.J. at 292, 777 A.2d 334.
The majority of plaintiffs' properties are not located in areas served by public sewers. However, the evidence presented at trial indicates that most of plaintiffs' properties are suitable for septic systems on one- or two-acre lots.
The only evidence that septic systems would not be suitable on some of plaintiffs' properties is a map prepared shortly before trial by Banisch Associates, Inc., which purports to show that plaintiffs' properties on the western side of the Turnpike have severe septic limitations. However, East Brunswick did not present any testimony regarding the expertise of the person who prepared the map, the data that person used to prepare the map, the methodology employed in preparing the map or how the map should be interpreted. Consequently, this map essentially constitutes a net opinion by East Brunswick's planning expert, Banisch, who was not qualified as an expert in septic systems. Moreover, Banisch's map is inconsistent with the septic suitability map prepared by Coastal Environmental Services, Inc. in April 1996 as part of a Natural Resource Inventory (NRI) of the municipality, which indicates that most of the land in the western section of RP district is suitable for septic systems. Coastal Environmental Services is an environmental consulting firm that reviewed extensive data regarding soil conditions in East Brunswick in preparing its map, and East Brunswick accepted Coastal's analysis of the suitability of land for septic systems until it presented Banisch's map in the middle of trial. In fact, Banisch testified that the NRI prepared by Coastal incorporated "the kind of maps that planners . . . utilize in determining what suitability certain lands have for certain types of development." The trial court made no finding as to whether Banisch's or Coastal's map accurately depicts the septic suitability of land in East Brunswick. However, we are satisfied from our own review of the record that the Coastal Environmental Services' map constitutes the only credible evidence of septic suitability. Therefore, we rely upon that map, which shows that most of plaintiffs' properties in the western section of the RP district are suitable for septic systems, in determining the reasonableness of the 2001 ordinances as applied to plaintiffs' properties.
Moreover, the DEP permitting and certification process, adopted under Realty Improvement Sewerage & Facilities Act (1954), N.J.S.A. 58:11-23 to -48, and other statutory provisions, see N.J.A.C. 7:9A-1.1 to -11.3, will assure that there is no development that will cause environmental damage on the portions of plaintiffs' properties that are in areas of severe septic limitations.
Some of plaintiffs' properties are located in areas of high aquifer recharge. However, the record indicates that the aquifer can be adequately protected by development on one- and two-acre lots. Indeed, the Middlesex County recommendation for protection of a water aquifer is no more than 20% lot coverage in residential zones, see The Lower Raritan-Middlesex County Water Resources Association of the Middlesex County Planning Board, A Recommended Aquifer Protection Strategy for Middlesex County, New Jersey 7 (November 1999) (unpublished, incorporated in the Middlesex County Comprehensive Master Plan), which can be easily achieved *405 by residential development on one and two-acre lots. Furthermore, the record indicates that such low-density residential development poses less risk of pollution of an aquifer than many of the agricultural activities currently being conducted on plaintiffs' properties, which involves the spraying of chemicals and disposal of animal waste.
Although the 2001 zoning ordinances identify retention of agricultural lands and support of agricultural activities as purposes of the downzoning of plaintiffs' properties, unlike the trial record that we reviewed in New Jersey Farm Bureau, Inc. v. Township of East Amwell, 380 N.J.Super. 325, 882 A.2d 388 (App.Div.2005), which is being filed simultaneously with this opinion, East Brunswick did not present any substantial evidence to support the conclusion that the downzoning of plaintiffs' properties will serve these purposes. Plaintiffs' agricultural economics expert, Soji Adelaja, testified that downzoning is not an effective method of preserving agriculture in an urban fringe area such as East Brunswick. Banisch testified that the only certain way to preserve agricultural land is through the permanent retirement of preservation easements. Therefore, the record does not support the conclusion that six-acre zoning of plaintiffs' properties, with cluster options, will preserve agricultural uses any more effectively than one- or two-acre zoning. In any event, even if it could be shown that the downzoning of plaintiffs' properties would make it somewhat more likely that some of them will continue to devote their land to agricultural uses, this would not provide an adequate justification for the economic hardship that this rezoning imposes on plaintiffs. See Pheasant Bridge, supra, 169 N.J. at 295, 777 A.2d 334.
The 2001 ordinances also identify the conservation of open space as a purpose of the downzoning. Although the rezoning of the RP district for lower density development than under the prior zoning ordinances probably will result in preservation of a greater amount of open space, especially if some plaintiffs avail themselves of one of the cluster options, a municipality may not compel private property to be devoted to preservation for open space by restrictive zoning that is not justified by environmental constraints or other legitimate reasons. See id. at 294-95, 777 A.2d 334. Instead, the municipality should acquire any properties that it deems necessary for open space preservation by payment of fair market value to the owners. See Mount Laurel Twp. v. Mipro Homes, L.L.C., 379 N.J.Super. 358, 371-74, 878 A.2d 38 (App.Div.2005).

III
We turn next to the reasonableness of the downzoning in the RP zone as applied to plaintiffs' individual properties. Because the RP zone consists of two quite distinct areas on opposite sides of the Turnpike, it is appropriate to consider the challenged ordinances separately with respect to the eastern and western sections of the zone.

A
The only privately-owned, undeveloped properties in the eastern section of the RP zone are those owned by plaintiffs Olga Clark, Katherine Himich, Middlesex County Fair Association, the Iaria Family trust and William and Roman Clark, Jr. These properties are contiguous to each other and comprise approximately 230 of the total of 1639 acres in the eastern RP zone.[3]
*406 Olga Clark's property is not currently farmed or put to any other productive use. The property directly adjoins a dense residential development. It is mostly level, except for slopes on the banks of Ireland's Brook that separate this property from the properties owned by other members of the Clark family. Areas of wetland along the brook are protected by DEP regulations. The property is included in East Brunswick's sanitary sewer plan area and was formerly zoned for three residential units per acre. East Brunswick's expert, Banisch, did not undertake to justify application of the RP district zoning to Olga Clark's property, and the trial court did not consider this property separate from the properties owned by other Clark family members. The requirement that this property be developed with only one unit per six acres is patently arbitrary. Mrs. Clark's property is indistinguishable from the small-lot residential development it adjoins, and there is no basis for the draconian downzoning of the property provided under the challenged ordinances.
The parcels owned by Katherine Himich and the Middlesex County Fair Association are adjoining properties that front on Cranbury Road, which is the main roadway running through the eastern section of the RP zone. This roadway has heavy truck and commuter traffic generated by warehouse development in South Brunswick and commercial uses along Route 18. The Himich property consists of 27.5 acres and the Fair Association property is 48 acres.[4] Apartment and townhouse development, built at a density of nine units per acre, lies directly across Cranbury Road from these properties. Municipal sewer lines run along Cranbury Road in front of both properties. Moreover, there is no evidence the Himich and Fair Association properties are incapable of accommodating septic systems on one-acre lots. Banisch testified that there is a "narrow wetland corridor" on the Himich property but he did not indicate it would create a significant obstacle to residential development. Therefore, the zoning of these properties for only one residence per six acres is not required by any environmental constraints on development and is inconsistent with existing development along Cranbury Road.
The Iaria property fronts on Fern Road and is bordered to the north by dense residential development. Municipal sewer lines run in front of the property along Fern Road. There are wooded wetlands on a portion of the site but the record does not indicate the extent of the wetlands or whether they would prevent full development of the site at one unit per acre. The record also does not indicate whether there are any septic limitations that would prevent such development. However, the State permitting requirements regarding subdivision of properties containing wetlands or requiring construction of septic systems would assure that development does not cause environmental damage. Therefore, any environmental constraints that may prevent full development of the site do not justify the limitation of development to one unit per six acres.
The parcels owned by William and Roman Clark, Jr. comprise the bulk of the 136 acres that are currently farmed by the Clark family. This property fronts on Dunhams Corner Road. A municipal water park is located directly to the northwest. There is no evidence of any environmental *407 constraints on development of this property that could justify the current restrictive zoning. Moreover, although there is a viable farming operation presently being conducted on the site, the record does not indicate that the current zoning will preserve agriculture any more effectively than the one-acre zoning that was previously in effect.
For these reasons, we conclude that the RP zone restriction of development to one unit per six acres, as applied to the remaining undeveloped, privately-owned properties in the eastern section of the RP zone, is not required by environmental constraints and does not reasonably conform with the character of existing development and is therefore arbitrary and unreasonable.

B
We turn next to the application of the RP zoning to the plaintiffs' properties located in the western section of the RP district. Those properties, unlike plaintiffs' properties on the east side of the Turnpike, are not contiguous but are instead scattered throughout the district. Furthermore, while the eastern section plaintiffs own nearly all the remaining undeveloped, privately-owned land in that area, the western section plaintiffs own less than one-quarter of the remaining undeveloped land in that area.
The Foerter property, which is slightly larger than thirty acres, is surrounded on three sides by small lot residential development. When the trial court asked Banisch if it made sense to include this property in the RP zone, he sought to justify the zoning on the ground that it is bordered by Farrington Lake. However, there is no evidence supporting Banisch's suggestion that lakeshore property is more environmentally sensitive than other property in the zone. The Foerter property has no wetlands or notable septic limitations, only about 0.10 acre is constrained by flood-plain, the only steep slopes are along the shoreline, and the property is surrounded by residential development on lots of less than one acre. Therefore, the downzoning of the Foerter property is not supported by any environmental constraints and does not conform with the character of existing development in the surrounding area.
The Joseph Bailes property is slightly less than thirty acres. There is a development of single-family detached dwellings on one-acre lots to the west of the property. A one-acre lot subdivision borders the property to the south. Single-family residences on one-and-a-half to two-acre lots are located to the north and northeast. Although almost 40% of this property contains wetlands and floodplains, the remainder has no steep slopes, septic limitations, or other environmental constraints. Moreover, the State permitting requirements with respect to wetlands would prevent any development that could cause environmental harm. Therefore, despite the wetlands conditions, the zoning for one unit per six acres is inconsistent with the existing pattern of development in the immediate area and thus arbitrary and unreasonable.
The Heim property is a 11.87 acre parcel located near the intersection of Riva Road and Church Lane, which is now occupied by a single-family dwelling. To the south are single-family dwellings on quarter-acre lots. Across Riva Road to the west is a hotel, and immediately to the north is a fire station. The eastern boundary of the property adjoins a utility easement. Farmland on the other side of the easement is the site of a pending proposal for cluster development. Approximately two-and-a-half acres of this site is covered by wetlands. There are no environmental constraints on development of the rest of the property, which is considered suitable for septic systems. Because this site is *408 surrounded by dense residential development and commercial uses, the application of one unit per six acres RP district zoning, which would not permit any additional residences on this less than twelve-acre site, does not reasonably conform to existing development in the area and is therefore arbitrary and capricious.
The Anthony and Jane Bailes property consists of 6.30 acres located close to the South Brunswick border. The area surrounding this property is mostly farmland but there are some residential dwellings on one-acre lots nearby. Approximately 1.16 acres in the property's southeastern corner is constrained by floodplains. The site is considered suitable for septic systems. Due to the incursion of the flood plain onto the site, only two residences could be constructed even under the prior one unit per two-acre zoning. Therefore, the downzoning of this property under the 2001 ordinances was arbitrary and capricious.
The Noebels property consists of 11.65 acres, located directly across the road from the property of Anthony and Jane Bailes. To the east and west along the adjoining roadway are single-family dwellings on one-acre lots. Other tracts in the area of the site are the subject of pending or approved cluster development applications, under which more than fifty residences will be constructed on lots of slightly more than one acre. Approximately one acre of the site is wetlands and the soil covering approximately half the property is considered to have severe septic limitations. Consequently, the statute and regulations governing wetlands and construction of septic systems would preclude development on parts of this property. However, in view of the development pattern in the surrounding area, there is no reasonable basis for limiting development of this site to one unit per six acres, which would allow only one residence to be constructed.
The Bocra property is a slightly more than twenty-acre site on which a commercial catering business is now conducted. There is also a single-family residence on the property. Between the catering facility and Riva Road are single-family dwellings on lots of varying sizes, some quite small. Except for a less than two-acre area in the flood plain, the property has no environmental constraints and is considered suitable for septic systems. In view of the dense nearby residential development and the absence of any significant environmental constraints upon development, the limitation of potential future residential development of the property to one unit per six acres is arbitrary and unreasonable.
For these reasons, we conclude that the downzoning of plaintiffs' properties to allow only one residential unit per six acres, with cluster options, is not required by the limited environmental constraints on development of these properties and does not reflect reasonable consideration of existing development in the area.

IV
East Brunswick also argues that the downzoning of the RP district should be upheld because it furthers the policies of the State Planning Act, N.J.S.A. 52:18A-196 to -207, and the State Plan adopted under this legislation. The State Planning Act delegates authority to the State Planning Commission to prepare and adopt a "coordinated, integrated and comprehensive plan for the growth, development, renewal and conservation of the State and its regions." N.J.S.A. 52:18A-199(a). The State Plan is required to "identify areas for growth, agriculture, open space conservation and other appropriate designations." Ibid. The State Planning Act directs that the State Plan be utilized as a "tool for assessing suitable *409 locations for infrastructure, housing, economic growth and conservation." N.J.S.A. 52:18A-196(c). Thus, the State Plan provides a guide for municipal planning. N.J.S.A. 52:18A-196(f). However, the State Plan is not binding on municipalities, and was not intended either to validate or invalidate specific ordinances. Mount Olive Complex v. Twp. of Mount Olive, 340 N.J.Super. 511, 543, 774 A.2d 704 (App.Div.2001), remanded on other grounds, 174 N.J. 359, 807 A.2d 192 (2002); N.J.A.C. 5:85-1.2(b).
The eastern section of the RP zone is classified as PA4, which is a designation that recommends the preservation of large contiguous areas of farmland. The western section of the RP zone is classified as PA5, which is a designation that recommends the limitation of growth and accompanying infrastructure to preserve environmentally sensitive areas.
In addition, the State Planning Commission incorporated an "equity policy" in the State Plan:
Where implementation of the goals, policies and objectives of the State Plan affects the reasonable development expectations of property owners or disproportionately affects the equity of other citizens, agencies at all appropriate levels of government should employ programs, including for example compensation, that mitigate such impacts to ensure that the benefits and burdens flowing from implementation of the State Plan are borne on an equitable basis.
. . . .
It is the position of the State Planning Commission that the State Plan should neither be used in a manner that places an inequitable burden on any one group of citizens nor should it be used as a justification for public actions that have the effect of diminishing equity. It is also the position of the Commission that the achievement, protection and maintenance of equity be a major objective in public policy decisions as public and private sector agencies at all levels adopt plans and policies aimed at becoming consistent with the State Plan.
[The New Jersey State Development and Redevelopment Plan 84-85 (2001).]
For the reasons previously discussed, the dramatic downzoning of plaintiffs' properties as a result of adoption of the 1999 and 2001 zoning ordinances cannot be reconciled with this equity policy. Most of East Brunswick, including substantial parts of the RP zone, has been developed with residences on small lots. Plaintiffs are a relatively small group of landowners who have continued to farm and conduct other low-intensity uses of their properties. Several plaintiffs are elderly persons whose properties are their primary assets. Consequently, it would impose an inequitable burden upon plaintiffs to limit development of their properties to the large-lot subdivisions now allowed in the RP zone. Moreover, there is no evidence that the one unit per acre and one unit per two acre zoning formerly permitted in this zone would be inconsistent with the PA4 and PA5 designations in the State Plan. Therefore, even assuming that those designations are proper, the dramatic downzoning of plaintiffs' properties is not required to implement the State Plan.

V
In sum, the downzoning of plaintiffs' properties to permit only one unit per six acres or, where a cluster option may be used, one unit per three or three-and-a-half acres, is not required by environmental constraints on development. Moreover, it is not reasonably designed to preserve farmland or open space and does not reflect reasonable consideration of existing development in the area of plaintiffs' properties. Therefore, this downzoning places an unfair burden upon plaintiffs and is not *410 reasonably calculated to serve any legitimate zoning purpose. For these reasons, the 1999 and 2001 ordinances that established this zoning are invalid.
Accordingly, the judgment of the trial court is reversed and the case is remanded for entry of a judgment declaring the zoning of the RP district to be invalid as applied to plaintiffs' properties and reinstating the zoning that applied to their properties before adoption of the 1999 and 2001 ordinances. See Pheasant Bridge, supra, 169 N.J. at 301, 777 A.2d 334.
NOTES
[1] East Brunswick agreed to purchase this property for $12,100,000 under its Green Acres acquisition program. Eighty percent of the purchase price is to be paid by the State and Middlesex County.
[2] Although the appeal was ostensibly filed on behalf of all plaintiffs owning properties on both the east and west sides of the Turnpike, plaintiffs' reply brief states that the Estate of Ernest Bergenfelter (plaintiffs Erna Diem and Mable Sigle) elected not to pursue the appeal.
[3] Plaintiff Heavenly Farms owned another approximately 147-acre undeveloped tract in the RP zone. However, as previously noted, East Brunswick has contracted to acquire this property for open space pursuant to a settlement agreement.
[4] We are advised that East Brunswick has acquired nine acres of the parcel for Fair Association's use as a public park since judgment was entered in this action.